## BUTLER *v.* CARTER *et al.*

No. 15013. JANUARY 6, 1945.

*W. S. Northcutt,* for plaintiff.

*Douglas B. Maggs, Archibald Cox, Bessie Margolin, George A. Downing, James H. Shelton,* and *Thomas J. Purdom,* as amici curiæ. *Richard T. Nesbitt,* for defendants.

WYATT, Justice. ▮ The Court of Appeals reversed the judgment of the trial court refusing the grant of a new trial, basing the opinion upon the theory that Butler, the plaintiff in the court below, could not recover for the overtime alleged to have been

worked, because in order to do so it became necessary for him to disclose an illegal and criminal transaction in which he participated, and, therefore, the courts will lend him no aid. We are called upon to decide in the first instance whether or not Butler became a party to, or engaged in, an illegal and criminal transaction. The contract set forth in the plaintiff's petition was a legal contract. See fair-labor standards act of 1938 (29 U. S. C. A., § 207 (3)). The contract itself being legal, the question remains whether or not the evidence disclosed that Butler became involved in an illegal and criminal transaction, in that he conspired to violate the fair-labor standards act. The portions of the act applicable to this question provide as follows: "Every employer subject to any provision of sections 201-219 of this title or of any order issued under sections 201-219 of this title shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time, and shall make such reports therefrom to the Administrator as he shall prescribe by regulation or order as necessary or appropriate for the enforcement of the provisions of sections 201-219 of this title or the regulations or orders thereunder." 29 U. S. C. A., § 211 (c). "After the expiration of one hundred and twenty days from the date of the enactment of sections 201-219 of this title, it shall be unlawful for any person . . to violate any of the provisions of section 211 (c) of this title, or to make any statement, report, or record filed or kept pursuant to the provisions of such section or of any regulation or order thereunder, knowing such statement, report, or record to be false in a material respect." § 215 (a) (5).

It will be noted that all duties with reference to the making, keeping, and preserving of records of the hours worked are placed entirely upon the employer. The making, and providing for inspection, of reports is likewise the sole responsibility of the employer. The law places no duty upon the employee with reference to these matters. What did the employee in the instant case do? He made no report to the administrator of the wage and hour division, and was required to make none. He did not keep, preserve, or provide any record for the administrator, and was required to do none of these things. He signed a pay-roll sheet, which showed

only forty hours per week, and on a separate record kept the number of hours he worked overtime. This he did, according to his testimony, at the express direction of the employer (whose duty it was to keep the record for the administrator), the employer keeping a similar record of overtime, and agreeing to settle with the employee as to the overtime at six-months' periods. Why did the employee thus keep the record? For no reason, so far as is disclosed by the evidence, other than that the employer, whose legal duty it was to keep and preserve the record, expressly directed the employee to keep the record in this manner. What reason did the employer give the employee for desiring the record kept in this manner? None. There could have been numerous reasons why the employer desired the regular time and the overtime kept separately other than a desire to avoid the requirements of the wage and hour law. The evidence of the plaintiff, accepted by the jury as true, disclosed that there was not to be any violation of the wage and hour law as to the wages to be paid him; but on the contrary that he was to be paid according to the exact terms of the act. It would seem, therefore, that there was no reason why Butler should even suspect that his employer intended to make a false report to the administrator. We do not believe, under the evidence in this case, that a finding to the effect that Butler participated in an illegal and criminal transaction is justified. In numerous district court and Circuit Court of Appeals opinions, the courts have commented on the fact that the duty of keeping records is one resting entirely upon the employer. We think that the plain, unambiguous terms of the act itself are sufficient authority for this position.

■ There is here presented a fundamental legal question. Even conceding that there was an agreement or conspiracy between the employer and the employee to violate the provisions of the fair-labor standards act, would that fact prevent a recovery on the part of the employee for the amount due him for overtime work as defined and provided for by the act? The fair-labor standards act provides: " (a) The Congress hereby finds that the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the

channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair marketing of goods in commerce. (b) It is hereby declared to be the policy of sections 201-219 of this title, through the exercise by Congress of its power to regulate commerce among the several States, to correct and as rapidly as practicable to eliminate the conditions above referred to in such industries without substantially curtailing employment or earning power." 29 U. S. C. A., § 202.

In Broughton v. Atlantic Co., 54 Fed. Supp. 185, Judge Russell, of the Northern district of Georgia, construing the fair-labor standards act, said: "As has been well recognized, the rights provided to the employee are not his alone, but are affected with a public interest, and they may not be waived or renounced either before or after they become due." The Broughton case was one in which the employer defended a suit for alleged partial unpaid wages for overtime, liquidated damages, and attorney's fees, contending that there had been an accord and satisfaction, by a bona fide settlement, as to these matters. Upon appeal to the United States Circuit Court of Appeals for the 5th circuit, the case was remanded to the district court in order that certain disputed issues of fact could be determined. The decision was by a divided court. In the majority opinion, the court said: "In the fair-labor standards act, Congress intended 'to achieve a uniform national policy of guaranteeing compensation for all work or employment engaged in by employees covered by the act. Any custom or contract falling short of that basic policy, like an agreement to pay less than the minimum wage requirements, cannot be utilized to deprive employees of their statutory rights.' [Tenn. Coal Co. v. Muscoda Local, 321 U. S. 590, 602.] Sections 6 and 7 of the act effectuate that policy by providing in mandatory language that every employer shall pay the wages prescribed, and sections 15 and 16 provide criminal punishment for any failure to comply therewith. [29 U. S. C. A., §§ 206, 207.] Though settlements in accord and satisfaction are favored in law, they may not be sanctioned and

enforced when they contravene and tend to nullify the letter and spirit of an act of Congress." [Guess v. Montague, 140 Fed. 2d, 500.] And in the dissenting opinion, it was said: "It is against the intent and command of the fair-labor standards act for a covered employer to pay less than the minimum wages provided by the act. 29 U. S. C. A., §§ 206, 216. It is also contrary to the law's policy for the employer to work such an employee longer than the prescribed hours without paying time and one-half for all overtime. 29 U. S. C. A., §§ 207, 216. The act is definitely a part of the public policy of the land as relates to the duties of the employer to an employee engaged in interstate commerce. No contract to hire and pay eligible employees less than the minimum wage prescribed by the act would be binding. . . The criminal provisions of the act are unilateral in that they apply only to the employer and not to the employee. As to an employee, no contract of his would be violative of the criminal provisions of the act because those provisions do not apply to him, and therefore the employer and employee would not be in pari delicto." Atlantic Co. v. Broughton, 146 Fed. 2d, 480. In American National Life Insurance Company v. Tabor, 111 Tex. 155 (230 S. W. 397), the Supreme Court of Texas said: "It is safe to assume that whenever the statute imposes a penalty upon one party and none upon the other, they are not to be regarded as in pari delicto."

"Substandard labor conditions were deemed by Congress to be 'injurious to the commerce and to the states from and to which the commerce flows.' United States v. Darby, 312 U. S. 100, 115 [61 Sup. Ct. 451, 85 L. ed. 609, 132 A. L. R. 1430]. To protect that commerce from the consequences of production of goods under substandard conditions, it may choose means reasonably adapted to those ends, including regulation of intrastate activities (p. 121) by minimum-wage and maximum-hour requirements (p. 123). Compare Santa Cruz Co. v. Labor Board, 303 U. S. 453, 466 (58 Sup. Ct. 656, 82 L. ed. 954). If overtime pay may have this effect upon commerce, private contracts made before or after the passage of legislation regulating overtime cannot take the overtime transactions 'from the reach of dominant constitutional power.' Norman v. B. & O. R. Co., 294 U. S. 240, 306-311 [55 Sup. Ct. 407, 79 L. ed. 885, 95 A. L. R. 1352]." Overnight Motor Transportation Co. v. Missel, 316 U. S. 572, 576 (62 Sup. Ct. 1216, 86 L. ed. 1682).

"Underlying the fair-labor standards act is the proposition that two separate and distinct factors may influence agreements on wages and hours made between employers and employees—employee bargaining power, and the requirements of the law. Resting on this proposition, the act has two major purposes: (1) to reinforce employee bargaining power concerning hourly wages by prohibiting wage rates below a certain level, and (2) to reinforce employee bargaining power concerning hours of labor by exerting financial pressure upon the employer to limit hours to a certain level. . . It has also been argued that the courts must give effect to the intention of the parties with respect to the regular rate of pay. However, our duty is to give effect to the intention of the parties only in so far as that intention complies with the law. In many familiar situations the intention of the parties is not permitted to defeat the announced policy of the legislature. Regardless of the intention of the borrower, money may not be loaned at a usurious rate of interest; regardless of the intention of the employee, an employer may not pay him wages less than the applicable minimum wage; regardless of a woman employee's intention, an employer may not require her to work more than the number of hours set by State statute. · The intention of the parties here should not be allowed to defeat the obvious intent of Congress in enacting the fair-labor standards act." Murray v. Noblesville Milling Co., 131 Fed. 2d, 470.

In Tennessee Coal, Iron & R. Co. v. Muscoda Local, 321 U. S. 590 (64 Sup. Ct. 698, 88 L. ed. 610), the court said: "But in any event it is immaterial that there may have been a prior custom or contract not to consider certain work within the compass of the work week or not to compensate employees for certain portions of their work. The fair-labor standards act was not designed to codify or perpetuate those customs and contracts which allow an employer to claim all of an employee's time while compensating him for only a part of it. Congress intended, instead, to achieve a uniform national policy of guaranteeing compensation for all work or employment engaged in by employees covered by the act. Any custom or contract falling short of that basic policy, like an agreement to pay less than the minimum-wage requirements, cannot be utilized to deprive employees of their statutory rights. Cf. Overnight Motor Co. v. Missel, 316 U. S. 572 [62 Sup. Ct. 1216,

86 L. ed. 1682]; Holden *v.* Hardy, 169 U. S. 366 [18 Sup. Ct. 383, 42 L. ed. 780]. See also Louisville & Nashville R. Co. *v.* Mottley, 219 U. S. 467 [31 Sup. Ct. 265, 55 L. ed. 297, 34 L. R. A. (N. S.) 671]; J. I. Case Co. *v.* Labor Board, 321 U. S. 332 [64 Sup. Ct. 576, 88 L. ed. 489]; Order of Railroad Telegraphers *v.* Railway Express Agency, 321 U. S. 342 [64 Sup. Ct. 582, 88 L. ed. 495]."

The fair-labor standards act, by the very terms of the act itself, states the objectives of the legislation to be the elimination of labor conditions detrimental to the maintenance of the minimum standard of living necessary for the health, efficiency, and general well-being of the employees, and the eradication of the burdens on commerce resulting from substandard labor conditions. 29 U. S. C. A., § 202. Because of the very nature of these objectives of this legislation, they become public problems in which every taxpayer has a vital interest. We consider these objectives of the legislation to be well expressed in the act itself. The act has been thus construed by the authorities cited in this opinion as well as by numerous other decisions of district courts and circuit courts of appeal. Therefore it becomes very clear that the requirements of the fair-labor standards act can not be avoided by any agreement or conspiracy which may be entered into by the employer and the employee, and the purpose of which is to violate its terms. The fair-labor standards act is a statute affected with a public interest, and it is against public policy to preclude payment of the compensation guaranteed by its terms because of any agreement, conspiracy, or subterfuge resorted to by the employer and the employee, either or both. The courts of this State have held repeatedly, as is pointed out in the majority opinion of the Court of Appeals, that no relief will be given by the courts to a person who seeks to enforce the terms of a contract based upon an illegal or unlawful consideration, for the reason that it would be against public policy to do so. Here we have the reverse of that rule. We deal with a perfectly legal contract, in the enforcement of which the entire public has a vital interest, so declared by both our legislative branch of government and our courts. The interest of the public in the enforcement of the contract now under consideration is such that it would be against public policy not to enforce the contract as to its provisions for the payment for overtime, regardless of any

agreement between the employer and the employee to make false records with reference to the number of hours worked.

We conclude, from what has been said above, that the judgment of the Court of Appeals must be

*Reversed.* *All the Justices concur.*

GRICE, DUCKWORTH, and ATKINSON, JJ., concur in the result.