AGUSTÍN MATÍAS RODRÍGUEZ, Plaintiff and Appellee, *v.* SOCIAL PROGRAMS ADMINISTRATION OF THE DEPARTMENT OF AGRICULTURE AND COMMERCE; SECRETARY OF AGRICULTURE AND COMMERCE, Defendants and Appellants.

No. R-63-67.      Decided April 1, 1965.

194

*J. B. Fernández Badillo, Solicitor General, Rodolfo Cruz Contreras, Deputy Solicitor General, Carlota Capó* and *Américo Serra, Assistant Solicitors General,* for appellants. *Guillermo Bobonis Díaz* for appellee.

Division composed of Mr. Acting Chief Justice Pérez Pimentel, Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

In order to curb certain undesirable characteristics presented by the system used by the state government and its agencies for the employment of laborers, the Legislative Assembly approved Act No. 110 of June 26, 1958, 3 L.P.R.A. §§ 711–711k (Supp. 1963, at 122–126), known as Irregular Government Personnel Act. Among other things it was said that overtime was paid to some workers while such compensation was not allowed to regular employees. 10-3 Journal of Proceedings 1551. *Cf. Communications Authority* v. *Superior Court,* 87 P.R.R. 1, 12 (1963). To that effect, § 3, 3 L.P.R.A. § 711b, although it authorizes payment of compensation for overtime, it sets forth that the latter shall be reduced to a minimum and only under extraordinary circumstances. It reads:[1]

---

[1] The report of the House Committee on Elections and Personnel on Senate Bill No. 321, which became Act No. 110, refers to that section as follows, Journal of Proceedings, *op. cit.* at p. 1552.

"Extra compensation for overtime shall be paid at double time to irregular personnel for services rendered in excess of eight hours on any working day [and] on Sundays or official holidays. In other words, the regular working day is established on the basis of eight hours daily and six days weekly (48 hours). The working period of regular personnel is from 37½ to 48 hours weekly."

See 3 R.&R.P.R. § 711a–11.

"The Government of Puerto Rico shall pay extra compensation to the irregular personnel it may use during overtime. The services rendered by irregular personnel in excess of eight hours on any working day or on Sundays or official holidays shall be compensated at double time on the basis of the regular compensation rate. Extra compensation shall always be paid in cash.

"The agencies shall reduce to a minimum the use of irregular personnel during overtime. Such use shall only be justified under the following circumstances:

(a) when the nature of the services rendered by the agency so requires;

(b) when the necessary personnel to complete certain tasks within the regular working hours is not available; or

(c) in case of emergency or when public welfare or security so requires."

Agustín Matías Rodríguez, master builder employed by the Social Programs Administration of the Department of Agriculture, filed a claim to recover compensation for extra hours worked from the year 1955 to the month of October 1959. Later, he limited it to the period from July 1, 1958, effective date of Act No. 110, to October 9, 1959, when he ceased working. The case having been heard on its merits, the trial court held that petitioner was entitled to receive the amount of $2,257.20 for compensation at the regular rate for work performed during 66 Saturdays; and, at double rate, for 4 hours worked on Sundays, and two extra hours daily during the other five workdays. We issued writ for review.

(1) There is no controversy as to the fact that Matías was an irregular employee comprised within Group 2 of the table of classification of positions prepared by the Director of the Office of Personnel, 3 R.&R.P.R. § 711a–19, which includes "Construction manager, journeyman or master workman (Skilled worker performing supervisory duties in carpentry, masonry, electricity, mechanics, plumbing, painting, or in other analogous trade or skill)." At the time of

the claim he was working in the project Río Hondo, in Comerío, sponsored by the Social Programs Administration as part of the low-cost housing program. In essence, this program consists of the construction of houses by means of a cooperative plan in which the residents of a certain community participate. Each and every one of the beneficiaries takes part in certain preliminary tasks, such as the loading, unloading, and transportation of equipment and construction materials; the group as a whole is then subdivided into groups of three or more persons, whose job is to prepare the lots for the construction up to the point when the houses are ready to be painted; the following sections of the houses are made under the system of group work: foundations, columns, walls, interior divisions, roofs, porches, door and window frames, and the smoothing of the concrete; the following details are the responsibility of each beneficiary: the painting of the house, doors, and windows, the electric installation, and sanitary service. *The work is carried out simultaneously* in all the houses at the same stage of construction, although if a beneficiary wishes to contribute additional work personally to his own house, he may do so, provided he makes the necessary arrangements with the project supervisor (the construction manager). See Arts. 3 and 4 of the Regulations of the Low-Cost Housing Program, 28 R.&R.P.R. §§ 527a–3 and 4, in effect since September 28, 1957.

Specifically, paragraph (e) of § 3 of said regulations provides that:

"Each family head shall agree to work personally one day during the workweek without pay. *Also, he shall agree to work with the group on either Saturday or Sunday such overtime hours as may be necessary* during the construction of the houses. . . ." (Italics ours.)

We have described at length the manner in which the low-cost housing program is carried out because it is the

best way to show that a reasonable probability exists for requiring the supervisor to render services during all the days of the week and even after four o'clock in the afternoon. At least, it was thus conclusively revealed by the evidence introduced at the hearing, and such a finding shall not be disturbed in the present review.

■ ■ (2) At this stage of the proceedings, appellant invokes the affirmative defense of estoppel not raised in the answer to the original complaint nor to the amended complaint. *Cobián* v. *Fuentes*, 79 P.R.R. 372–379 (1956); *Hernández* v. *Caraballo*, 74 P.R.R. 27, 34 (1952). It insists that claimant was and always has been his own supervisor as to the hours and days worked, and that the payrolls were prepared and his wage paid on the basis of the weekly report which he himself submitted to the main office; and that, under such circumstances, the administration did not have and could not have any other basis to determine the work performed. Appellant cites *Mortenson* v. *Western Light & Telephone Co.*, 42 F.Supp. 319, 321 (Iowa 1941). We do not doubt that in a proper case estoppel, under the circumstances pointed out, can defeat an action for overtime. Some element of deception on the part of the employee must generally intervene, such as concealing that he works overtime, keeping a secret record of the extra hours worked, or making false reports of the number of hours worked. *Cotton* v. *Weyerhaeuser Co.*, 147 P.2d 299 (Wash. 1944); *Gale* v. *Fruehauf Trailer Co.*, 145 F.2d 125 (Kan. 1944); *Dollar* v. *Caddo River Lumber Co.*, 43 F.Supp. 822 (Ark. 1941). Now then, estoppel does not operate when employee's conduct consists in accepting merely a wage inferior to the one actually earned, *Warren-Bradshaw Drilling Co.* v. *Hall*, 317 U.S. 88 (1942); *Overnight Motor Co.* v. *Missel*, 316 U.S. 572 (1942); waiting until he stops working to start action for overtime, *Wilson Oil Co.* v. *Hardy*, 164 P.2d 209 (N.M.

1945); *Lewis* v. *Nailling*, 36 F.Supp. 187 (Tenn. 1940); or making false entries in payroll sheets in accordance with an agreement to that effect made with the employer, *Butler* v. *Carter*, 32 S.E.2d 808 (Ga. 1945).

■  However, assuming that the facts were as related by appellant, since the court a quo did not come to any determination on that score, we must presume that it believed the explanation given by plaintiff:

"Q. How many hours did you report as worked?

A. Well, the Administration compelled us, the construction managers, to work after four o'clock, without limit.

Q. My question is, did you make that report?

A. Yes, sir.

Q. And in that report, how many hours did you report as worked?

A. Sometimes all the hours worked.

Q. That is, over forty and forty-eight hours?

A. Yes, sir.

Q. Or over eight hours a day?

A. Yes, sir.

Q. Was your attention called on some occasion to that fact?

A. Yes, sir.

Q. What did they say?

A. In some of the reports I sent *I stated the time I had worked and then they protested, I was reprimanded.*

Q. What time did you report?

A. If I worked from four to seven, that was the time I reported.

Q. And what happened?

A. Then, for the time I reported after four o'clock, *I was scolded and they told me that I would pay for it if I reported that overtime.*

Q. What did they require, that you report what?

A. *Then, they ordered me to report only from seven to four.*

Q. Eight hours daily?

A. Yes, sir.

Q. And what did they say?

A. That I would be discharged from work.

Q. In fact, were you discharged?
A. Yes, sir, I was." (Italics ours.)

which he then ratified on cross-examination:

"Q. Mr. Matías, can you tell me, if you remember the date on which you say you were reprimanded with respect to a report you made which showed that you had worked after four o'clock?
A. I am going to tell you something . . .
Q. Do you remember the exact date?
A. I cannot remember the exact date, but I do know that it happened several times and I quarrelled with the supervisors. I asked them questions, I asked them why was I deprived of those rights if I worked ten or fourteen hours; *and on one occasion I took two or three time sheets and filled them out with those hours and the supervisor himself made me tear those time sheets and set down eight hours of work.*" (Italics ours.)

The element of deception, which is required for applying estoppel, is not present in this case.

■ (3) *Sierra* v. *Eastern Sugar Associates*, 71 P.R.R. 832 (1950), disposes of the contention on the sufficiency of the evidence to establish the hours worked overtime. The testimony presented and the documentary evidence show that petitioner performed work for which he was not compensated, and there is sufficient evidence to show the amount and extent of the work performed to permit the just and reasonable inference of the respondent court. On the other hand, no evidence whatsoever was introduced to controvert this aspect of the claim, for defendant relied rather on the fact that it had given final instructions not to work in excess of the legal working day. Even if it were a question of an approximate result, the discretion exercised was reasonable. *Vélez* v. *Royal Bank*, 65 P.R.R. 912 (1946); *Lebrón* v. *P.R. Ry. Lt. & P. Co.*, 78 P.R.R. 650, 664 (1955).

■ (4) The last error assigned related to a ruling made in connection with the answer to some interrogatories, if

committed, would not entail the reversal since it was not shown that it prejudiced appellant.

The amended judgment[2] of the Superior Court, San Juan Part, rendered on February 15, 1963, will be affirmed.

---

[2] Pursuant to § 33 of the Minimum Wage Act of 1956, 29 L.P.R.A. § 246(e) (Supp. 1963, at 169), its provisions among which there is one entitling a laborer to recover, as an additional compensation, an amount equal to the unpaid amount, § 30(a), 29 L.P.R.A. § 246(b) (Supp. 1963, at 166), shall not apply to persons employed by the Government of the Commonwealth of Puerto Rico, with the exception of those agencies or instrumentalities of the latter which operate as private businesses or enterprises. See, *Tulier* v. *Land Authority*, 70 P.R.R. 249 (1949).