**WALLING, Adm'r of Wage and Hour Division, U. S. Dept. of Labor, v. PARAMOUNT–RICHARDS THEATRES, Inc.**

Civil Action No. 659.

District Court, E. D. Louisiana.

June 16, 1945.

Douglas B. Maggs, Sol., and Archibald Cox, Associate Sol., both of Washington, D. C., Amzy B. Steed, Regional Atty., of Birmingham, Ala., Faye Blackburn, Sr. Atty., of Washington, D. C., and Alexander E. Ralston, Jr., Associate Atty., of New Orleans, La., for plaintiff.

Rosen, Kammer, Wolff, Hopkins & Burke, of New Orleans, La., for defendant.

CAILLOUET, District Judge.

This action was brought under Section 17 of the Fair Labor Standards Act of 1938, 29 U.S.C.A. §§ 201–219, which is hereinafter referred to as the Act, and it seeks to have the defendant, its officers, agents, servants, employees, attorneys, and all persons acting or claiming to act in its behalf and interest, permanently enjoined from violating the provisions of Sections 15 (a) (2) and 15(a) (5) of the Act. Sec. 215(a) (2, 5), 29 U.S.C.A.

The cause was submitted to the Court for decision upon the pleadings and the parties' stipulation as to all material facts, the pertinent portion whereof reads as follows, viz.:

"I. All facts hereinafter set forth, except when expressly qualified, relate to the entire period involved in the above-styled cause.

"II. The defendant, Paramount-Richards Theatres, Inc., is a Delaware Corporation and was incorporated in 1935. One-half of its stock is owned by Paramount Pictures, Inc. and the remaining one-half of its stock is owned by E. V. Richards.

"Prior to the fall of 1940, Paramount-Richards Theatres, Inc., did not own and operate any individual motion picture theatres but was a holding company controlling the stock of a corporate structure involving forty corporations and including those corporations which ultimately owned and operated the theatres. The defendant, Paramount-Richards Theatres, Inc., then held all of the stock of Saenger Theatres Corporation. Said Saenger Theatres Corporation held all of the stock of Saenger Realty Corporation, W. S. M. B., Capital Theatres, Inc., Saenger-Ehrlich Enterprises, Inc., Saenger Theatres of Texas,

Inc., and Kennington-Saenger Theatres, Inc., respectively. Saenger Theatres Corporation and Saenger Realty Corporation each held controlling stock in numerous other subsidiary companies. Saenger Theatres Corporation and its subsidiaries, Saenger Realty Corporation and its subsidiaries, Capital Theatres, Inc., Saenger-Ehrlich Enterprises, Inc., Saenger Theatres of Texas, Inc., and Kennington-Saenger Theatres, Inc., each respectively owned motion picture theatres. W. S. M. B., Inc., owned and operated a 5,000 watt radio station in New Orleans, Louisiana.

"In 1940, all the subsidiaries of Saenger Realty Corporation were merged into Saenger Realty Corporation; and all the subsidiaries of Saenger Theatres Corporation were merged into Saenger Theatres Corporation. Then Saenger Realty Corporation was merged into Saenger Theatres Corporation. Then Saenger Theatres Corporation was merged into Paramount-Richards Theatres, Inc. As a result of these successive corporate mergers, the defendant, Paramount-Richards Theatres, Inc., became an owner of numerous motion picture theatres and at present owns forty-three of the sixty-nine individual theatres hereinafter listed.

"The defendant, Paramount-Richards Theatres, Inc., now owns one-half of the stock in W. S. M. B., Inc., Capital Theatres, Inc., Saenger-Ehrlich Enterprises, Inc., and Kennington-Saenger Theatres, Inc., and owns all of the stock in Saenger Theatres of Texas, Inc. The said W. S. M. B., Inc. owns and operates a 5,000 watt radio station in New Orleans, Louisiana. The said Capital Theatres, Inc. owns and operates the four theatres in Baton Rouge, Louisiana, hereinafter listed (excluding Drive-In). The said Saenger-Ehrlich Enterprises, Inc. owns and operates the eight theatres in Shreveport, Louisiana, hereinafter listed (excluding Drive-In). The said Kennington-Saenger Theatres, Inc. owns and operates the five theatres in Jackson, Mississippi, hereinafter listed (excluding Drive-In). The said Saenger Theatres of Texas, Inc. owns and operates the three theatres in Texarkana, Texas, hereinafter listed (excluding Drive-In).

"The defendant, Paramount-Richards Theatres, Inc., does not own any stock in Paramount-Richards Enterprises, Inc. One-half of the stock of Paramount-Richards Enterprises, Inc. is owned by Paramount Pictures, Inc. and the remaining one-half of its stock is owned by E. V. Richards. Paramount-Richards Theatres, Inc. and Paramount-Richards Enterprises, Inc. are thus companion corporations owned by the same stockholders. The said Paramount-Richards Enterprises, Inc. owns and operates the three Drive-In theatres in Pensacola, Florida, Baton Rouge, Louisiana, and Mobile, Alabama, hereinafter listed and operates for the account of Kennington-Saenger Enterprises, Inc. the Drive-In theatre in Jackson, Mississippi, hereinafter listed, and operates for the account of Richards-Ehrlich Enterprises, Inc. the Drive-In theatre in Shreveport, Louisiana, hereinafter listed, and operates for the account of Saenger Theatres of Texas, Inc. the Drive-In theatre in Texarkana, Texas, hereinafter listed.

"Paramount-Richards Enterprises, Inc. owns one-half of the stock in each of the three owning corporations for whose respective accounts it operates the three Drive-In theatres in Jackson, Mississippi, Shreveport, Louisiana, and Texarkana, Texas.

"III. Throughout the period covered by this suit, central executive, administrative and supply offices, separate and apart from the individual theatres, have been maintained in New Orleans, Louisiana, for a total of from sixty-five to sixty-nine motion picture theatres located in Mississippi, Alabama, Texas, Florida and Louisiana. The employees involved in this action are employed in the central executive, administrative and supply offices in New Orleans, Louisiana.

"Prior to the fall of 1940, Saenger Theatres Corporation (which was owned entirely by Paramount-Richards Theatres, Inc.) operated the central executive, administrative and supply offices. Subsequent to the fall of 1940 (when Saenger Theatres Corporation was merged into Paramount-Richards Theatres, Inc.) Paramount-Richards Theatres, Inc. has operated and is presently operating these central offices. There has been no material or substantial change in the actual operations carried on by the central offices or in their actual relationship with the individual motion picture theatres or radio station during the entire period covered by this action.

"IV. Prior to the period covered by this suit, Capital Theatres, Inc. (which owns and operates four theatres in Baton Rouge, Louisiana) Kennington-Saenger Theatres, Inc. (which owns and operates five thea-

tres in Jackson, Mississippi) Saenger Theatres of Texas, Inc. (which owns and operates three theatres in Texas) and W. S. M. B., Inc., each entered into contracts with Saenger Theatres, Inc. 'employing' said Saenger Theatres, Inc. 'to supervise the operation and management' of the theatres or the radio station which each respectively operated and 'the corporations owned or controlled by' each; 'to keep the books and accounts thereof'; 'to book pictures and other attractions for said theatres'; 'to attend to the acquisition and distribution of all motion picture films and supplies and accessories for said theatres'; 'and generally to do everything necessary to the conduct and control of said theatres' or radio station.

"The owning and operating corporations further 'in consideration of, and as payment for said services' agreed to pay to Saenger Theatres, Inc. 'four (4%) per cent of the gross box office receipts' of the theatres then or thereafter owned and operated by said corporations, such payment to 'include the overhead expenses of the party of the second part at its home office in the City of New Orleans.' In 'consideration of and as payment for said services,' W. S. M. B. agreed to pay to Saenger Theatres, Inc. 'four (4%) per cent of its gross revenue,' such payment to 'include the overhead expenses of the party of the second part at its home office in the City of New Orleans.' A complete copy of a typical contract is attached hereto and marked Exhibit A.

"By resolution, Saenger-Ehrlich Enterprises, Inc. provided for payment of 'a sum equal to four per cent of the gross admissions of the theatres which' Saenger-Ehrlich Enterprises, Inc. operated to Saenger Theatres, Inc. 'for services rendered to the corporation in management and supervision, buying and booking of motion picture films and other attractions and the keeping of books of account of the corporation.' A complete copy of this resolution is attached hereto and marked Exhibit B.

"Saenger Theatres, Inc. in 1933 filed a petition in bankruptcy under Section 77B of the Bankruptcy Act [11 U.S.C.A. § 207] and was reorganized in 1935 as Saenger Theatres Corporation. When Saenger Theatres Corporation was merged into Paramount-Richards Theatres, Inc. in 1940, the defendant, Paramount-Richards Theatres, Inc. succeeded to its duties and obligations under the contracts hereinabove described and assumed operation of the central executive, administrative and supply offices.

"V. Paramount-Richards Enterprises, Inc. did not enter into any contract with Saenger Theatres, Inc. or with Saenger Theatres Corporation or with Paramount-Richards Theatres, Inc. with respect to the relationship between these said corporations and the individual theatres which it owns and/or operates. Furthermore, Paramount-Richards Enterprises, Inc. did not compensate either of these corporations and is not now compensating the defendant, Paramount-Richards Theatres, Inc., for the functions performed for, the supervision exercised over and the records and accounts maintained for each of the individual theatres which Paramount-Richards Enterprises, Inc. owns and/or operates.

"The central executive, administrative and supply offices of the defendant perform the same functions for, exercise the same type of supervision over and maintain similar records and accounts with respect to each of the sixty-nine individual theatres irrespective of the existence of a contract between defendant and their owners and/or operators with respect thereto and irrespective of the receipt of compensation by defendant therefor.

"VI. The central executive, administrative and supply offices purchase for and supply to the individual theatres virtually all of the supplies, equipment and materials needed for the operation of the individual theatres; negotiate the contracts for and arrange for the delivery of the motion picture films to be displayed; plan the publicity for and arrange for the advertising of the films to be shown; maintain records and accounts with respect to the business conducted by the individual theatres; prepare reports to the owners of the individual theatres relative to their respective business operations; prepare all tax records and reports and make all tax payments with respect to the business conducted by the individual theatres.

"VII. Some of the individual motion picture theatres with respect to which these above-described functions are performed are owned by the defendant; some of the individual motion picture theatres with respect to which these functions are performed are owned by separate corporations in which the defendant is a partial stockholder; and some of the individual motion picture theatres with respect to which these

functions are performed are owned or are operated by separate corporations in which the defendant holds no stock whatsoever.

"The central executive, administrative and supply offices perform the same functions for, exercise the same type of supervision over, and maintain similar records and accounts with respect to each of the sixty-nine individual theatres irrespective of whether they are owned and operated by the defendant, or are owned and operated by a corporation in which the defendant holds stock or are owned and operated by a corporation in which the defendant holds no stock whatsoever.

"VIII. The individual motion picture theatres with respect to which defendant performs the functions, exercises the supervision and maintains the accounts and records hereinabove referred to and hereinafter more fully described, are, and their locations are, as follows:

| Theatre | Location |
| --- | --- |
| Paramount | Alexandria, La. |
| Saenger | Alexandria, La. |
| Rex | Alexandria, La. |
| Drive-In | Baton Rouge, La. |
| Hart | Baton Rouge, La. |
| Louisiana | Baton Rouge, La. |
| Paramount | Baton Rouge, La. |
| Varsity | Baton Rouge, La. |
| Buck | Biloxi, Miss. |
| Saenger | Biloxi, Miss. |
| Chickasaw | Chickasaw, Ala. |
| Delta | Clarksdale, Miss. |
| Paramount | Clarksdale, Miss. |
| Delta | Greenville, Miss. |
| Paramount | Greenville, Miss. |
| Lyric | Greenville, Miss. |
| Leflore | Greenwood, Miss. |
| Paramount | Greenwood, Miss. |
| Gulf | Gulfport, Miss. |
| Paramount | Gulfport, Miss. |
| Buck | Hattiesburg, Miss. |
| Lomo | Hattiesburg, Miss. |
| Rose | Hattiesburg, Miss. |
| Saenger | Hattiesburg, Miss. |
| Buck | Jackson, Miss. |
| Century | Jackson, Miss. |
| Drive-In | Jackson, Miss. |
| Majestic | Jackson, Miss. |
| Paramount | Jackson, Miss. |
| Pix | Jackson, Miss. |
| Alberta | Meridian, Miss. |
| Strand | Meridian, Miss. |
| Temple | Meridian, Miss. |
| Crown | Mobile, Ala. |
| Empire | Mobile, Ala. |

| Theatre | Location |
| --- | --- |
| Loop | Mobile, Ala. |
| Lyric | Mobile, Ala. |
| Saenger | Mobile, Ala. |
| Drive-In | Pritchard, Ala. |
| Capital | Monroe, La. |
| Delta | Monroe, La. |
| Paramount | Monroe, La. |
| Grand | Natchez, Miss. |
| Ritz | Natchez, Miss. |
| Globe | New Orleans, La. |
| Saenger | New Orleans, La. |
| Tudor | New Orleans, La. |
| Drive-In | Pensacola, Fla. |
| Isis | Pensacola, Fla. |
| Rex | Pensacola, Fla. |
| Saenger | Pensacola, Fla. |
| Capital | Shreveport, La. |
| Centenary | Shreveport, La. |
| Drive-In | Shreveport, La. |
| Majestic | Shreveport, La. |
| Rex | Shreveport, La. |
| Saenger | Shreveport, La. |
| Strand | Shreveport, La. |
| Venus | Shreveport, La. |
| West End | Shreveport, La. |
| Drive-In | Texarkana, Texas |
| Paramount | Texarkana, Texas |
| Strand | Texarkana, Texas |
| Texan | Texarkana, Texas |
| Alamo | Vicksburg, Miss. |
| Saenger | Vicksburg, Miss. |
| Strand | Vicksburg, Miss. |
| Buck | Vicksburg, Miss. |
| Winona | Winona, Miss. |

"There are sixty-nine of the above-listed individual motion picture theatres, and of these theatres twenty-three (or one-third of the total number) are located within the State of Louisiana, and forty-six of these theatres (or two-thirds of the total number) are located outside of, and within States other than, the State of Louisiana.

"IX. Each of the individual theatres which Paramount-Richards Theatres, Inc. owns and operates and each of the individual theatres which is owned and operated by corporations with which Paramount-Richards Theatres, Inc. has a management-service contract as hereinabove described are charged monthly an amount equal to four per cent (4%) of the revenue which that particular theatre derives from admissions, as compensation to the defendant for the function which its central executive, administrative and supply offices perform for the individual theatres. W. S. M. B., Inc., is charged an amount equal to four

per cent (4%) of its gross revenue as compensation to the defendant for the functions which defendant's central executive, administrative and supply offices perform for it.

"The total gross revenue currently derived each month from admissions by all of the sixty-nine individual theatres in the circuit is approximately $600,000. More than one-half of these total gross receipts are derived from theatres located outside the State of Louisiana and more than one-half of the total sum paid to the defendant as compensation for the functions which its central executive, administrative and supply offices perform are paid by theatres located outside the State of Louisiana.

"X. The central executive, administrative and supply offices of the defendant maintain and use the following facilities in New Orleans, Louisiana:

"Main offices located on the second and third floors of a building at 608 Canal Street,

"Supply quarters located on the first and second floors of a building at 119–121 Camp Street,

"Supply quarters located on four floors of an air-conditioned and refrigerated building at 233 Chartres Street,

"Shipping quarters located on the first floor of a building at 1305 Cleveland Avenue,

"Warehousing quarters located at 4903 Laurel Street,

"Warehousing quarters located at 2622 N. W. Prier Street,.

"The two warehousing quarters are approximately four miles from the main offices and are used to store the trucks and the heavy equipment sent out to and received from the individual theatres from time to time.

"The main offices and the supply quarters are only a few blocks apart and these and the shipping quarters are in constant and continuous contact with each other.

* * * * * *

"More specifically the various subdivisions of defendant's central executive, administrative and supply offices are engaged in the following operations:

"XI. A Maintenance and Supply Department is maintained on the first and second floors of the building located at 119–121 Camp Street, New Orleans, and approximately four employees are employed there. A stock of supplies needed in the operation of the individual theatres and radio station is maintained there, including as a few examples, paper cups, janitor supplies, lamps, light bulbs, flash lights, and repair parts for the motion picture equipment. Approximately eighty-five per cent of all the supplies received in this Department are shipped to it from points outside the state of Louisiana. Such items as pop corn bags and boxes are delivered by the carload from extrastate and are sent out to the individual theatres just as soon as they arrive. Incoming goods are ordinarily consigned to 119–121 Camp Street and are delivered twice daily by Railway Express to the Shipping Department which makes three delivery and pick-up trips daily to the Maintenance and Supply Department. A 'Receiving Book' is maintained in the Maintenance and Supply Department listing all incoming shipments received each day. A daily 'Receiving Report' is made up from this record for the Accounting Department.

"Stock lists showing the items available from stock are distributed periodically to the individual theatres and radio station. Sample stock lists are attached hereto and marked Exhibit C. The individual theatres and radio station order the supplies they need on a form designated 'Requisition for Supplies from Stock,' a copy of which is attached hereto and marked Exhibit D.

"All such orders for supplies and parts are checked, assembled, packed and addressed to the individual theatres and are then delivered to the trucks of the Shipping Department on one of its three daily pick-up and delivery trips to the Maintenance and Supply Department. These orders are picked up twice daily from the Shipping Department and delivered to the theatres by Railway Express. Approximately two-thirds of these shipments are to theatres outside the State of Louisiana. A 'Shipping Book' is maintained in the Maintenance and Supply Department listing all outgoing shipments sent each day. A daily 'Shipping Report' is made up from this record for the Accounting Department.

"The Maintenance and Supply Department is also engaged in repairing standard motion picture equipment for the individual theatres, including the projection machines, the sound equipment, the ticket dispensing machines and pop corn machines. Normally the projection machine of each theatre is sent to this Department for a

complete overhauling at least once a year. On such occasions a 'loaned projector' is shipped to the theatre for temporary use. The 'loaned projector' is shipped back to the Maintenance and Supply Department by the theatre after the repaired projector has been delivered to it. Approximately two-thirds of this repair work is performed on equipment which is shipped to theatres outside the State of Louisiana.

"All of the employees in this department are engaged either in receiving and unpacking the incoming goods or in assembling and packing, preparing and shipping the outgoing goods to the individual theatres or in repairing equipment for the individual theatres.

"XII. An Accounting Department is maintained on the third floor of the main central office building located at 608 Canal Street, New Orleans, and approximately eighteen employees are employed there. This department purchases all of the supplies. It receives memoranda from the Maintenance and Supply Department three or four times a week listing the stock items which are needed. It then prepares the orders and conducts any correspondence or negotiation which is necessary to the purchase of these supplies, most of which are received from outside the State of Louisiana. The individual theatres and radio station also order supplies which they need which are not included on the stock lists on a form designated 'Purchase Order.' Usually these orders come directly to the Accounting Department from each theatre and from the radio station but occasionally they are sent from the Maintenance and Supply Department when the goods which a particular theatre or radio station has requisitioned from that Department are not available in stock. On receipt of these orders the Accounting Department prepares orders providing for direct shipment from the vendor to that particular theatre or radio station, and conducts any correspondence or negotiation which is necessary to the purchase of these supplies. Increasingly, the stock of the Maintenance and Supply Department is maintained as an emergency supply and a large part even of the stock items is ordered to be shipped directly to the individual theatres or the radio station. More than 75% of all equipment and supplies used by the theatres or radio station are ordered by the Accounting Department to be shipped directly to the individual theatres or radio station, and practically all of these goods are delivered in interstate commerce. Copies of the orders as sent by the Accounting Department are mailed to the individual managers. Copies of the invoices are sent by the vendor to the individual managers and to the Accounting Department at the time shipment is made. After the theatre manager has checked the goods on receipt against the invoice, he sends an approval of the invoice for payment to the Central Office.

"On the basis of the 'Receiving Report' transmitted daily from the Maintenance and Supply Department, the Accounting Department maintains in a 'stock book' a record of all incoming goods received and carried in stock. On the basis of the 'Shipping Report' received daily from the Maintenance and Supply Department and the 'Requisitions' from the individual theatres and the radio station which are transmitted to this Department after they have been filled, the Accounting Department keeps a record of all outgoing goods shipped to the theatres or the radio station from stock and decreases the record of stock on hand accordingly. It then enters on each requisition form the price which the particular theatre or the radio station should be charged for the supplies provided. From these requisitions a 'weekly charge analysis' sheet is made up each week for each theatre and for the radio station. A carbon copy of this record reflecting the prices charged on each item ordered, is sent to each theatre and to the radio station. These charges are then in turn entered on an account ledger of the expenditures to be charged against the respective theatres, and radio station. The goods supplied to the radio station out of stock are mainly office supplies. A card file is also maintained showing separately the kind and amount of supplies sent to each one of the theatres and to the radio station from stock and the dates of the respective shipments. The freight bills from Railway Express for each of these shipments are received, checked, approved and paid by this Department. Each of these paid bills is entered on the accounts kept of the expenditures to be charged against each theatre and against the radio station. The freight bills paid by each theatre on the direct shipments are also checked and separately recorded in this Department.

"The Accounting Department checks the correctness of all invoices and prepares

and issues the checks in payment for all purchases of supplies, both supplies received in stock and supplies delivered directly to each theatre and the radio station. This Department also receives each week from each theatre manager and from the manager of the radio station a reimbursement voucher for all disbursements he was required to make during that week for the particular theatre. This Department audits and checks those vouchers and each week prepares and mails a reimbursement check to the manager of each theatre and to the manager of the radio station. From copies of these reimbursement checks entries are made listing the charges against each theatre and its owning and operating corporation and against the radio station. Each theatre manager's box office receipts are deposited regularly to the account of the owning and operating corporation in the town where the particular theatre is located. Although arrangements are made by the Accounting Department with some of the local banks to have these funds automatically transferred to the banks used by the central home office in New Orleans, Louisiana, the Accounting Department usually and periodically draws checks on these local banks to effect this transfer of funds and central home office collection of all receipts. This Department checks and pays the telephone bill including charges for long-distance calls between the local theatres and the home office and between the home office and companies with whom they are negotiating relative to motion picture films and the Western Union bill for like negotiations and contacts by telegraph.

"Invoices are sent to this Department for the films for each picture made available for rental under contracts with the various film producing and distributing corporations. Checks in payment of the film rentals are prepared and mailed to the film producing and distributing corporations. On the basis of these invoices and the booking schedules for each local theatre sent to the Accounting Department by the Booking Department, a 'Film Rental and Booking Register' is maintained. From this record ledger entries are made charging each individual theatre for the rental of the film.

"Each theatre submits to the Accounting Department each day a box office report for the previous day. These individual reports of box office revenue are transcribed into the cash book and into the individual profit and loss ledger accounts maintained for each theatre. From these daily reports submitted by the theatres and from the other record of expenses allocable to each theatre some of which have been hereinbefore described, separate 'Weekly Theatre Operating Reports' for each of the theatres and the radio station are made up each week. Copies of these 'Weekly Theatre Operating Reports' for each of the theatres and for the radio station are prepared for and sent each week to Paramount Theatres, Inc., in New York City. A sample form for the weekly theatre operating report is attached hereto and marked Exhibit E.

"In addition, copies of these 'Weekly Theatre Operating Reports' for each of the theatres in Jackson, Mississippi, owned and operated by Kennington-Saenger Theatres, Inc., are prepared for and sent to it at Jackson, Mississippi, and for each of the theatres in Texarkana, Texas, owned and operated by Saenger Theatres of Texas, Inc. are prepared for and sent to it at Texarkana, Texas.

"Weekly summary sheets, based on the individual weekly operating reports and the other records of expenses and income allocable to each of the theatres, collect, assemble, and accumulate the net profit and loss data with respect to all of the theatres each week. A sample form (3 pages) of the weekly balance sheet is attached hereto and marked Exhibit F. Copies of this weekly summary sheet of operating results are prepared for and sent each week to Paramount Theatres, Inc. in New York City. Both quarterly and annual balance sheets are also prepared for and sent to the above-enumerated owning and/or operating corporations for each of the theatres above-described.

"The local manager of each theatre in Mississippi, Alabama, and Florida sends to the Accounting Department a report of admissions and a preliminary computation of state and federal admission taxes due and a report of confection sales and a preliminary computation of state confection taxes due. The tax payments are rechecked and recomputed in the Accounting Department and a single admission tax report and a single confection tax report are prepared for each state, which lists necessary data individually for each theatre and collectively for all the theatres in the State. These reports and the tax payment checks are mailed monthly to the state revenue

agents in Mississippi, Alabama, and Florida respectively. The federal admission tax reports for all of the theatres are similarly prepared and the reports and accompanying checks are mailed to the federal Collector of Internal Revenue in New Orleans, Louisiana.

"The Accounting Department maintains the Social Security and Unemployment Compensation records and prepares the Social Security and Unemployment Compensation reports for all of the employees of the theatres, for all of the employees of the radio station and for all of the employees of the home office. The theatre or radio station manager sends in to the home office an 'Employees Service Record' for each employee when he is first employed which includes all of the necessary Social Security and Unemployment Compensation data. Each week each of the theatre managers and the manager of the radio station sends a payroll record to the Accounting Department on a form entitled 'Theatre Pay Roll' which is attached to his Manager's Fund Report. From these 'Theatre Pay Roll Records' the Accounting Department posts each individual employee's Service Record every week. Every three months state Social Security and Unemployment Compensation reports are prepared for and sent to the state Social Security representatives in Mississippi, Alabama, Florida, Louisiana and Texas and federal Social Security reports are prepared for and sent to the federal Social Security representative in New Orleans, Louisiana. Every month Federal Income Withholding Tax Reports are prepared for and sent to the federal Collector of Internal Revenue at New Orleans, Louisiana. Each individual theatre sends the Social Security and Unemployment Compensation tax funds and the Federal Income Withholding Tax funds deducted from the employees' wages to the home office where they are placed in accounts carried in the names of the owning and operating corporations. All Social Security and Unemployment Compensation tax payments are made from the home office to Mississippi, Alabama, Florida, Louisiana, and Texas and to the federal representative in New Orleans, Louisiana, and all Federal Income tax payments are made from the home office to the federal Collector of Internal Revenue at New Orleans, Louisiana.

"W. S. M. B. is designated as the employer of the radio station employees; the owning and operating corporation of a particular local theatre is designated as the employer of that particular theatre's employees; and Paramount-Richards Theatres, Inc., is designated as the employer of the home office employees.

"Two or three times a week general instruction memoranda are prepared, mimeographed and mailed to each of the theatre managers. Occasionally it is also necessary to correspond with the theatre managers to rectify errors in reports, to clarify data submitted or to give special instructions.

"All of the employees in the Accounting Department are engaged in various phases of the activities described and there is a considerable amount of exchange and shifting of duties.

"XIII. A Booking Department is maintained on the third floor of the main central office building located at 608 Canal Street, New Orleans, and approximately five employees are employed there. This Department handles the negotiations with the motion picture producing or releasing companies relative to the contracts for the leasing of films for all feature pictures and "Shorts" for all of the individual theatres. Most of these negotiations are carried on with the central offices of the motion picture producing or releasing companies located in New York City. Contracts are entered into periodically with the following companies:

(1) Paramount Pictures Corporation

(2) Metro-Goldwyn Mayer

(3) 20th Century Fox Film Distributing Corporation

(4) Vitagraph (releasing First National and Warner Bros. Pictures)

(5) R. K. O. Radio Pictures Corporation

(6) United Artists Corporation

(7) Columbia Pictures Corporation

(8) Republic Pictures Corporation

(9) Universal Film Distributing Corporation

(10) Monagram Pictures Corporation

(11) Producers Distributing Corporation.

"The first six companies above-enumerated offer their pictures for lease singly or 'in blocks' of from eight to twelve. Each of the remaining companies lease under a single contract all pictures which it will release during the year. No contracts have been effected with Metro-Goldwyn Mayer

during the last year and one-half or with Universal Film Distributing Corporation during the last three years. About half of these contracts are in the form of formal written contracts prepared in this Department and about half of them are memorandum contracts reflected in the record of correspondence.

"The Booking Department makes up tentative booking schedules for each individual theatre after the film leases are negotiated. Paramount-Richards Theatres, Inc. usually has a preference of release dates for the showing of films because it is the representative of the largest circuit of theatres in this locality. Each theatre daily sends a box office report to the Booking Department to serve as a guide in the selection of pictures for that particular theatre. Final 'Feature Booking Schedules' are then made up separately for each theatre listing the pictures which will be shown each day at that theatre. These booking schedules are then mailed out to the respective theatres. They are sent regularly once a month and more often if changes or revisions are necessary. A copy of the form for the Feature Booking Schedule is attached hereto and marked Exhibit G. Copies are sent to the film exchanges so that the film distributing companies will know when they will be required to ship the picture films to the circuit of Paramount-Richards, Inc. Copies are sent to the Accessory Department in order to advise this department which promotional materials should be sent to each local theatre. Copies are sent to the Publicity Department for its use in determining what publicity arrangements should be made for each theatre and what publicity instructions should be issued to its local manager. Sometimes copies of this booking schedule are sent to the radio station for spot announcements. Copies are sent to the Accounting Department so that they can verify the invoices sent from the film companies for payment. Conformed lists are subsequently prepared and sent to the film exchanges shortly prior to show date in order to advise the film distributing companies which films should be sent for each theatre on the specified dates. A copy of this form list is attached hereto and marked Exhibit H.

"On the basis of these booking schedules, the Booking Department makes up each day for the Shipping Department a 'shipping sheet" showing which films are to have been delivered by the distributing companies to their film exchanges and are to be picked up there and shipped by the Shipping Department to the theatres.

"All of the employees in the Booking Department are engaged in various phase of the activities described.

"XIV. A Publicity Department is maintained on the third floor of the main central office building located at 608 Canal Street, New Orleans, and three employees are employed there. This department arranges for and supervises all newspaper, radio, screen and miscellaneous advertising and publicity for all of the pictures shown at all of the theatres. The advertising contracts which are negotiated are of from a month to a year's duration. Although some negotiations or arrangements originate in the circuit they all must flow through this Department for approval and coordination. This Department corresponds with each theatre manager instructing him with respect to the proper use of the advertising materials being sent to him for each picture and ordinarily providing him with a unified publicity 'plan.' This Department negotiates arrangements with the following radio stations to broadcast advertising announcements of the pictures being shown at the theatres within their particular locality:

| | |
|---|---|
| W. S. M. B. | New Orleans, La. |
| K. A. L. B. | Alexandria, La. |
| W. J. P. R. | Greenville, La. |
| W. F. O. R. | Hattiesburg, Miss. |
| W. C. O. C. | Meridian, Miss. |
| W. M. O. B. | Mobile, Ala. |
| W. A. L. A. | Mobile, Ala. |
| W. C. O. A. | Pensacola, Fla. |
| K. T. B. S. | Shreveport, La. |
| K. R. M. D. | Shreveport, La. |
| K. C. N. C. | Texarkana, Texas. |

"The recording disks for these radio announcements are sent to the Publicity Department from New York City and are sent, in turn, by the Publicity Department through the Shipping Department to the various radio stations, hereinbefore listed.

"The Press books and the accompanying mats for the newspaper advertising are sent to the Publicity Department from New York City and are delivered through the film exchanges. The Publicity Department sends these Press Books and accompanying mats, in turn, to the newspapers in the town where the particular picture is being shown. Each day the local theatre managers send

in to the Publicity Department 'tear sheets' from the newspapers showing the final newspaper advertisement and each week the Publicity Department checks and makes up an evaluation of such advertising.

"The special announcement trailers for advertising on the motion picture screens are sent to the Publicity Department from New York City and are delivered through the film exchanges.

"All of the employees in the Publicity Department are engaged in some phase of the activities described.

"XV. An Accessory Department is maintained on the second floor of the main central office building located at 608 Canal Street, New Orleans, and approximately three employees are employed there. A stock of advertising materials to be used in connection with the showing of each motion picture is maintained there, including, as just a few examples, lithographed papers, photographs, newspaper mats, posters, stills from the particular attraction, insert cards, window cards, press notices, lobby displays, sets and heralds. On the basis of the booking schedules received from the Booking Department, the Accessory Department makes up accessory orders on a form, a sample of which is attached hereto and marked Exhibit I, for whatever accessory materials there are to advertise each of the pictures being shown for the first time in the circuit at the theatres designated. These materials are usually bought but are sometimes rented from the film distributing companies through the film exchanges. On receipt of this accessory order the film company ships the accessory materials direct to the theatre. The film company returns copies of the order with the shipping invoice to the Accessory Department where it is checked and forwarded to the Accounting Department for payment and proper charge against the particular theatre. As soon as the first showing is ended the theatre sends this advertising material back to the Accessory Department and these incoming goods, addressed to the Accessory Department, are delivered twice daily by Railway Express to the Shipping Department which makes three delivery and pick-up trips daily to the Accessory Department. These returned accessories are received, unpacked, classified, sorted and made ready for distribution to the next theatre. When the booking schedules indicate that this same picture is scheduled to be shown at another theatre, the various advertising materials and supplies are assembled, classified, wrapped, packed and addressed to the particular theatre and are then delivered to the trucks of the Shipping Department on one of its three daily pick-up and delivery trips to the Maintenance and Supply Department. These supplies are picked up twice daily from the Shipping Department and delivered to the local theatres by Railway Express. Thus the material is being continuously sent back and forth between the individual theatres, and this central Accessory Department. When accessories are being sent from stock, this Department prepares an 'Accessory Invoice,' a form copy of which is attached hereto and designated Exhibit J. One copy of this invoice is enclosed with the package that is shipped. Another copy of this invoice is sent to the Accounting Department for proper charge against the particular theatre.

"The Accessory Department also maintains a stock of office supplies such as stationery, paper and blotters and a stock of forms which are needed by the theatres and radio station. Stock lists showing the items of forms or office supplies available are distributed periodically to the theatres and radio station and samples of such lists, including the Accessory Department items, are attached hereto and designated Exhibit C. The local theatres and radio station order the office supplies and forms they need on a form designated 'Requisition For Supplies From Stock,' a copy of which is attached hereto and marked Exhibit D.

"All orders for stationery and forms (received from the Shipping Department after the items ordered from that Department have been checked off and shipped) are checked, assembled, packed and addressed to the local theatres and are then delivered to the trucks of the Shipping Department on one of its three daily pick-up and delivery trips to the Accessory Department. These orders are picked up twice daily from the Shipping Department and delivered to the local theatres by Railway Express.

"All of the employees in the Accessory Department are engaged either in receiving and unpacking the incoming goods from the individual theatres or in assembling, packing, preparing and shipping the outgoing goods to the individual theatres.

"XVI. A Shipping Department is maintained on the first floor of a building located at 1305 Cleveland Avenue, New Or-

leans, and approximately three employees are employed there.

"All incoming goods are consigned to the main offices at 608 Canal Street and all the outgoing goods are addressed to the particular theatre to which they are being sent. The Railway Express Agency, however, has a special arrangement with Paramount-Richards Theatres, Inc., to route all incoming and outgoing freight through a single centralized Shipping Department solely in order to facilitate speedier delivery and shipment. The employees in this Department consequently make three pick-up and delivery trips each day to the various departments of the home office gathering the materials and supplies which are to be shipped to all of the theatres, and delivering to these various departments the incoming materials and supplies shipped by the individual theatres and the vendor companies from which supplies are being purchased. The employees in this Department, on the basis of the Shipping Sheet made up in the Booking Department, also make trips to the film exchanges gathering up the currently scheduled films which have been sent there by the Film Distributing Companies. When a theatre has completed its use of the films, it usually returns them also through the Shipping Department but occasionally, in compliance with previous instruction, ships them directly to the next theatre at which they are scheduled. A Railway Express truck makes two pick-up and delivery trips daily to the Shipping Department. Approximately two-thirds of the outgoing shipments are to theatres outside the State of Louisiana, and approximately two-thirds of the incoming shipments from the theatres are from theatres outside the State of Louisiana. This Department maintains a record of shipments made each day and also fills out the Railway Express tickets.

"All of the employees in the Shipping Department are engaged either in receiving and delivering the incoming goods or in receiving and shipping outgoing goods.

"XVII. In addition to the activities of the departments above described certain miscellaneous activities are performed in the main central office at 608 Canal Street.

"A telephone switchboard is maintained on the first floor of this building and two employees are employed in the operation of this switchboard. They daily transmit and receive both local and long distance incoming and outgoing calls to and from all departments. The long distance calls are mainly with out of state theatres but frequently are with motion picture distributing companies in New York City or with vendors from whom supplies are purchased.

"An elevator is maintained and is operated continuously during office hours. The outgoing mail from the various departments is picked up twice daily from the various departments and is sorted and placed in envelopes or bundles at the mail desk. Two trips to the main post office building in New Orleans, Louisiana, are made daily to post the mail and to pick up the incoming mail at the post office box which defendant maintains there. The incoming mail is delivered from the mail desk to the various departments twice daily. Form letters, instructions and bulletins are regularly mimeographed two or three times a week for distribution to the individual theatres of the circuit. Regular janitorial services are performed for the various office quarters. Approximately five employees regularly interchange the elevator-operating, mail, mimeographing and janitorial duties and each week perform each of these types of activities as described.

"In addition to the files maintained in each department, a central file system is maintained for the whole office and a complete record is maintained of all requisitions, purchase orders, reports, and correspondence from the theatres, and all orders to and correspondence with vendors of supplies, and all data with respect to theatre operations prepared for, maintained for, and sent to the owning and/or operating companies. Four employees are regularly employed in maintaining these files.

"Two watchmen regularly perform custodial duties protecting the premises against fire and trespass during all times when the offices are closed.

"XVIII. All of the employees in the Maintenance and Supply Department, the Accounting Department, the Booking Department, the Publicity Department, and the Accessory Department regularly work forty-two hours each workweek. The employees in the Accounting Department work forty-six hours during one workweek in each quarter when Social Security records and payments are due. The employees in the Shipping Department regularly work forty-seven hours during each workweek and regularly work fifty hours during each third workweek. The telephone operators

regularly work alternately thirty-seven and one-half and forty-five hours during each workweek. The employees who perform the elevator-operating, mail mimeographing and janitorial duties regularly work forty-five hours a week. The regular watchman regularly works sixty-seven and one-half hours during each workweek.

"None of the employees are paid time and one-half their regular rate for hours worked during the workweek in excess of forty. None of the employees were paid time and one-half their regular rate for hours worked during the workweek in excess of forty-four and forty-two during the periods when such total maximum number of hours were fixed by the statute.

"XIX. Four of the employees who perform the elevator-operating, mail, mimeographing and janitorial duties are paid twelve dollars for a workweek of forty-five hours or less than twenty-four cents an hour.

"XX. Defendant has not maintained, during the period involved in this action, records as prescribed by the Administrator's Regulations, Part 516, issued pursuant to Section 11(c) of the Act [29 U.S.C.A. § 211(c)]. The wage records which defendant maintains do not show with respect to each employee the hours worked each work day and each workweek, the regular rate of pay, the basis upon which wages are paid, the total straight time earnings for each workweek and the total weekly overtime excess compensation."

Plaintiff's complaint, which prays for a permanent injunction, alleges that, although the defendant is an employer subject to the provisions of the Fair Labor Standards Act of 1938 it has nevertheless been engaged "in ordering, booking, receiving, and distribution of moving picture films and in the production, sale, and distribution of moving picture equipment, theatre accessories, and advertising matter," and that "substantially all of the goods handled" by approximately 60 employees, "have been, and are being handled and produced for and in interstate commerce, and are being shipped, delivered, transported, offered for transportation, and sold in interstate commerce from points outside the State of Louisiana to, into and through said state, and from points within the said state to, into and through other states."

The complaint further alleges that ever since October 24, 1938, defendant has always been:

(1) a violator of Sections 6 and 15(a) (2) of the Act "by paying to many of its employees, for their employment in interstate commerce or in the production of goods for interstate commerce, as aforesaid, wages" at less than the respective minimum hourly rates prescribed since said October 24, 1938;

(2) a violator of Sections 7 and 15(a) (2) of the Act, "by employing many of its employees in interstate commerce or in the production of goods for interstate commerce as aforesaid, for workweeks" longer than the maximum hours prescribed, respectively, and not paying them wages, for such overtime employment, at a rate of not less than one and one-half times the regular rate of their straight-time employment; and

(3) a violator of Section 11(c) and 15 (a) (5) of the Act by failing "to make, keep, and preserve adequate and accurate records of its employees, and the wages, hours, and other conditions and practices of employment maintained by it * * * in that the records kept by defendant failed to show adequately and accurately, among other things, the hours worked each workday and each workweek, the regular rate of pay, the basis upon which wages are paid, the total straight-time earnings for each workweek, and the total weekly overtime excess compensation with respect to many of its employees."

The defendant's answer is to the effect that defendant "is not engaged in interstate commerce or in the production of goods for commerce," and is, therefore, "not subject to or governed by" the Act.

The sole issue thereby submitted for determination is, merely:—

Are the persons employed in defendant's central executive, administrative and supply offices and performing the duties assigned to them respectively, all as detailed in Articles X through XVII of the stipulation, "engaged in commerce or in the production of goods for commerce"?

■ First, it should be observed that, in considering whether or not defendant is subject to the operative control of the Fair Labor Standards Act (with respect to its employment of approximately 49 persons, in the conduct of its "central executive, administrative and supply offices" as an aggregation of separate work units, entirely apart and distinct from the sixty-nine theatres listed and referred to in

Article VIII of the stipulation), one must bear in mind thât, as the United States Supreme Court has repeatedly held, the application of the Act depends on the character of the employee's activities rather than on the nature of the employer's business. A. B. Kirschbaum Co. v. Walling, 1942, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638; Warren-Bradshaw Drilling Co. v. Hall, 1942, 317 U.S. 88, 63 S.Ct. 125, 87 L.Ed. 83; Walling v. Jacksonville Paper Co., 1943, 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460; Overstreet v. North Shore Corporation, 1943, 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656.

Defendant contends that it is neither engaged in commerce nor in the production of goods for commerce.

■ The first phrase "engaged in commerce" covers every employee in "the channels of interstate commerce," and if defendant's employees, while rendering the stipulated services in its said "central executive, administrative and supply offices" were and are either in or *closely related to,* the movement of commerce between the several states mentioned in the stipulation, then the provisions of the Act do apply to them as employees "engaged in commerce".

If there be any other activities carried on by said employees within the course and scope of their employment by defendant, such additional activities are governed by the second phrase, i. e., "production of goods for commerce," if in point of fact the activities are within the purview of the Fair Labor Standards Act of 1938.

■ To the extent that such employees are "engaged in commerce or in the production of goods for commerce," defendant, as their employer, is itself so engaged. Fleming v. Jacksonville Paper Co., 5 Cir., 1942, 128 F.2d 395, 397, 398; McLeod v. Threlkeld, 1943, 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538; Walling v. Mutual Wholesale Food & Supply Co., 8 Cir., 1944, 141 F.2d 331, 335, 336; New Mexico Public Service Co. v. Engel, 10 Cir., 1944, 145 F.2d 636, 638, 639.

■ By "commerce," as used in the Act, is to be understood "trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof"; and in determining what constitutes "commerce" or "engaged in commerce," within the provisions of the statute, one should be guided by practical considerations. Fair Labor Standards Act of 1938, § 3, 29 U.S.C.A. § 203; Overstreet et al. v. North Shore Corporation, 1943, 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656.

■ The Act defines "produced" as meaning "produced, manufactured, mined, *handled,* or in any other manner *worked on* in any State," and said Act specifically provides that, for its purposes, an employee "shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, *handling,* transporting, or in any other manner *working on* such goods, or in any process or occupation necessary to the production thereof, in any State." 29 U.S.C.A. § 203 (j) (Emphasis supplied.) By "goods" is meant "goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof *other than a producer,* manufacturer, *or processor thereof."* Fair Labor Standards Act of 1938, Section 3, 29 U.S.C.A. § 203, supra; Warren-Bradshaw Drilling Co. v. Hall, 1942, 317 U.S. 88, 63 S.Ct. 125, 87 L.Ed. 83, supra.

Congress thus made clear what, within the intendment of the Act, is meant by the phrase "engaged * * * in the production of goods for commerce," but it did not define "handled" or "worked on"; however, the United States Supreme Court lately expressed itself as being clear that the terms in question include "every kind of incidental operation preparatory to putting goods into the stream of commerce." Western Union Telegraph Co. v. Lenroot, 323 U.S. 490, 65 S.Ct. 335, 342, 89 L.Ed. ——.

■ A broad practical consideration of the situation presented by defendant's maintenance and operation of its central, administrative and supply offices, as reflected by the pleadings and the parties' stipulation, drives one to the inescapable conclusion that, under the provisions of the Fair Labor Standards Act of 1938 and the jurisprudence relating thereto, all of defendant's employees rendering service in and about the six establishments listed in Article X of the stipulation, in the manner and to the extent detailed in succeeding Articles XI through XVII, have been continuously engaged in interstate com-

304

merce or in the production of goods for commerce ever since October 24, 1938.

■ However, defendant's counsel now argue that, conceding the foregoing conclusion to be well-founded, the pertinent provisions of the Fair Labor Standards Act, nevertheless, do not apply to their client because (so it is contended) defendant is "a service establishment within the meaning of Section 13(a) (2)" of the Act. In the first place, it is well to observe that the exemption referred to relates only to "any employee engaged in any retail or service establishment *the greater part of whose selling or servicing is in intrastate commerce.*" (Emphasis supplied.) 29 U. S.C.A. § 213. So that, considering the matters stipulated by the parties, defendant would not be benefited even were it proper to now attach importance to counsel's contention, in the face of what defendant's answer contains. The pleading is no more, substantially, than a general denial to the effect that no operation carried on by it in its central executive, administrative and supply offices constituted the engaging by it in interstate commerce or in the production of goods for interstate commerce, and that, therefore, defendant is not subject to or governed by the provisions of the Act; for which reason—and for nothing else—does defendant pray that plaintiff's complaint be dismissed and its demands rejected.

When, as here, litigants stipulate the facts, to be considered by the Court together with their pleadings in arriving at a decision in the cause at issue, such stipulation can not make the case broader than the pleadings.

33 Corpus Juris (1924), Judgments, § 94, p. 1154.

In any event, as the United States Supreme Court took occasion to observe lately:

"The Fair Labor Standards Act was designed 'to extend the frontiers of social progress' by 'insuring to all our able-bodied working men and women a fair day's pay for a fair day's work.' Message of the President to Congress, May 24, 1934. Any exemption from such humanitarian and remedial legislation must therefore be narrowly construed, giving due regard to the plain meaning of statutory language and the intent of Congress. To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people. * * *" A. H. Phillips, Inc., v. Walling, 1945, 65 S.Ct. 807, 808, 89 L.Ed. ——.

■ On the face of the record in this present cause, it is clearly apparent that defendant, as respects its operations in and from its central executive, administrative and supply offices is not "plainly and unmistakably" within the terms of Section 13(a) (2) of the Fair Labor Standards Act.

The following are the Court's findings of fact and conclusions of law, viz.:

Findings of Fact.

1. All of defendant's employees in its central executive, administrative and supply offices, located in New Orleans, Louisiana, and numbering approximately forty-nine, have been performing services for defendant ever since October 24, 1938, as follows, to-wit:

(1) *At 608 Canal Street:*

(a) Two, as telephone switchboard operators;

five (approximately), interchangeably, as elevator operators, as janitors, as twice-daily carriers of mail to and from the New Orleans United States Post-Office, and mimeographers of form letters, instructions and bulletins for distribution to the moving picture theatres under defendant's direction, supervision and control;

four, as operators of defendant's central filing system;

two, as watchmen;

(b) eighteen (approximately), in its Accounting Department;

(c) five (approximately), in its Booking Department;

(d) three, in its Publicity Department;

(e) three (approximately), in its Accessory Department.

"(2) *At 119–121 Camp Street:*—

(a) four (approximately), in its Maintenance and Supply Department.

"(3) *At 1305 Cleveland Avenue:*—

(a) three (approximately), in its Shipping Department.

2. The payment of wages to such employees, and the hours worked by them, respectively, during each work week are as set out in the hereinabove reproduced Articles XVIII and XIX of the parties' stipulation.

3. Defendant, during the period of time involved in this action, has not made, kept and preserved records with respect to said named employees, as prescribed by the Administrator of the Wage and Hour Division, United States Department of Labor (Administrator's Regulations, Part 516), pursuant to the requirements of Section 11 (c) of the Fair Labor Standards Act. 29 U.S.C.A. § 211(c).

Conclusions of Law.

1. The Court has jurisdiction over the parties and of the subject-matter involved herein. Sec. 17, Fair Labor Standards Act of 1938, Act of June 25, 1938, c. 676, 52 Stat. 1060, 29 U.S.C.A. § 201 et seq., hereinafter referred to as the Act.

2. All of defendant's employees rendering service in its central executive, administrative and supply offices in New Orleans, Louisiana, as hereinabove detailed, have been continuously engaged in commerce or in the production of goods for commerce, within the intendment of the Act, since October 24, 1938.

3. Defendant, as respects its operations in and from its said central executive, administrative and supply offices is not "plainly and unmistakably" within the terms of Section 13(a) (2) of the Act, and, in no manner, is it exempt from the full operative scope and effect of said Act, insofar as the statute relates to the aforementioned employees in defendant's central executive, administrative and supply offices.

4. Defendant has violated the provisions of Sections 6 and 15(a) (2), Sections 7 and 15(a) (2), and Sections 11(c) and 15(a) (5) of the Act, respectively, and continues to do so.

5. Plaintiff's prayer for a permanent injunction prohibiting and enjoining defendant Paramount-Richards Theatres, Inc., its officers, agents, servants, employees, and all persons acting or purporting to act in its interest and behalf, from further violating the provisions of Section 15(a) (2) and (a) (5), of the Fair Labor Standards Act of 1938, as respects defendant's operations in and from its said central executive, administrative and supply offices in New Orleans, Louisiana, which are presently located as hereinabove detailed in Finding of Fact No. 1, is well-founded and should be granted.

In view of the Court's foregoing findings of fact and conclusions of law, the usually-required compliance with local Court Rule 2(d), of the Civil Rules, is dispensed with and judgment shall be entered forthwith, in due course.