WARREN-BRADSHAW DRILLING CO. *v.* HALL, AGENT, ET AL.

No. 21. Argued October 16, 1942.—Decided November 9, 1942.

*Mr. Frank Settle,* with whom *Mr. Sam Clammer* was on the brief, for petitioner.

*Mr. Dallas Scarborough,* with whom *Mr. Ellis Douthit* was on the brief, for respondents.

*Solicitor General Fahy* and *Messrs. Irving J. Levy, Mortimer B. Wolf,* and *Peter Seitz* filed a brief on behalf of the Administrator of the Wage and Hour Division, U. S. Department of Labor, as *amicus curiae,* urging affirmance.

MR. JUSTICE MURPHY delivered the opinion of the Court.

We are concerned here, as in *Kirschbaum Co.* v. *Walling,* 316 U. S. 517, with a problem of statutory delineation, not

constitutional power, in the application of the Fair Labor Standards Act[1] to a particular situation. This is an action to recover unpaid overtime compensation and an equal amount as liquidated damages, brought by respondent employees under § 16 (b). We must decide whether respondents are engaged "in the production of goods for commerce," within the meaning of § 7 (a) of the Act. The district court held that they were so engaged, and, since petitioner had failed to compensate them for overtime hours as required by § 7 (a), accordingly rendered judgment for each respondent in the appropriate amount.[2] The Circuit Court of Appeals affirmed with an immaterial modification,[3] and the case comes here on certiorari.

The application of the Act depends upon the character of the employees' activities. *Kirschbaum Co.* v. *Walling, supra,* p. 524. The burden was therefore upon respondents to prove that, in the course of performing their services for petitioner and without regard to the nature of its business, they were, as its employees, engaged in the production of goods, within the meaning of the Act, and that such production was for interstate commerce. We agree with both courts below that respondents have sustained that burden.

Petitioner is the owner and operator of rotary drilling equipment and machinery, who contracts with the owners or lessees of oil lands to drill holes to an agreed-upon depth short of the oil sand stratum. When that depth is reached, the rotary rig is removed, and the machinery and crew move on to other locations. For reasons peculiar to the oil industry, a cable drilling crew then undertakes with cable tools to "bring in" the well, or else demonstrate that it is a dry hole. Respondents were employed by peti-

---

[1] 52 Stat. 1060, 29 U. S. C. § 201 *et seq.*

[2] 40 F. Supp. 272.

[3] 124 F. 2d 42.

tioner as members of its rotary drilling crew and worked on approximately thirty-two wells in the Panhandle Oil Field of Texas; thirty-one of those wells produced oil, and the other one produced gas. Petitioner was not the owner or lessee of any of the lands on which respondents drilled, and was not shown to have any interest therein or in the oil produced.

In § 3 (j) Congress has broadly defined the term "produced," [4] and has provided that "an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State." Whether or not respondents, in drilling to a specified depth short of oil, may be regarded as engaged in producing or mining—and we certainly are not to be understood as intimating that they may not—recognition of the obvious requires us to hold that, at the very least, they were engaged in a "process or occupation necessary to the production" of oil. Oil is obtained only by piercing the earth's surface; drilling a well is a necessary part of the productive process to which it is intimately related. The connection between respondents' activities in partially drilling wells and the capture of oil is quite substantial, and those activities certainly bear as "close and immediate tie" to production as did the services of the building maintenance workers held within the Act in *Kirschbaum Co.* v. *Walling, supra,* pp. 525–526.

The evidence supports the finding that some of the oil produced ultimately found its way into interstate commerce. All the wells had pipeline connections, some of them being with petroleum companies operating on a

---

[4] " 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; . . ."

national scale, wherein the oil was commingled with the production of other wells. Officials of the State of Texas testified that some crude oil is shipped out of the State by these pipelines, and that a large percentage of crude oil sent to refineries in Texas thereafter passes out of the State in the form of refined products.

Petitioner contests the applicability of the Act on the ground that it, as an independent contractor not financially interested in the wells, had no intention, expectation or belief that any oil produced would be shipped in interstate commerce, and cites as support *United States* v. *Darby,* 312 U. S. 100, 118, where it was said that the "production for commerce" intended by Congress includes "at least production of goods, which, at the time of production, the employer, according to the normal course of his business, intends or expects to move in interstate commerce although, through the exigencies of the business, all of the goods may not thereafter actually enter interstate commerce." Respondents counter with the proposition that it is enough that the owners of the oil wells expected the oil produced to move across state lines, but the Government does not ask,[5] and there is no need for, us to pass upon that proposition. The Act extends at least to the employer who expects goods to move in interstate commerce. *United States* v. *Darby, supra.* Assuming that such expectation, or a reasonable basis therefor, was necessary on petitioner's part before the application of the Act to petitioner, it is here present. The record contains ample indication that there were reasonable grounds for petitioner to anticipate, at the time of drilling, that oil produced by the wells drilled, would move into other states. Petitioner, closely identified as it is with

---

[5] The Solicitor General submitted a brief on behalf of the Administrator of the Wage and Hour Division, United States Department of Labor, as amicus curiae.

the business of oil production, cannot escape the impact of the Act by a transparent claim of ignorance of the interstate character of the Texas oil industry. *St. John* v. *Brown*, 38 F. Supp. 385, 388; cf. *Fleming* v. *Enterprise Box Co.*, 37 F. Supp. 331, 334–335, affirmed, 125 F. 2d 897.

One final contention merits but slight consideration. Respondents were employed on the basis of an eight hour day and regularly worked seven days a week, receiving fixed wages ranging from $6.50 to $11 per day. There was no agreement providing for an hourly rate of pay or that the weekly salary included additional compensation for overtime hours. Petitioner urges that it complied with the overtime compensation requirements of the Act because respondents received wages in excess of the statutory minimum wage, including time and one-half of that minimum wage for all overtime hours, which wages respondents impliedly agreed included overtime compensation by accepting them. A similar argument was squarely rejected in *Overnight Motor Co.* v. *Missel*, 316 U. S. 572.

*Affirmed.*

Mr. Justice Roberts:

I dissent, as I did in *Kirschbaum Co.* v. *Walling*, 316 U. S. 517, and for the same reason. But I think the present a more extravagant application of the statute than that there approved. We may assume that Congress, in drafting the Act, had in mind the practical, as distinguished from a theoretical, distinction between what is national and what is local,—between what, in fact, touches interstate commerce and what, in truth, is intrastate.

The phrases on which respondents rely are these: An employee "who is engaged in [interstate] commerce or in the production of goods for [interstate] commerce," § 7 (a); and " 'Produced' means produced, manufactured,

mined, handled, or in any other manner worked on in any State; and for the purposes of this Act an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State," § 3 (j).

The opinion disavows any thought that the respondents may be classed as those who mine the oil which passes into commerce; but this seems to be a reservation intended not to preclude such a holding. The Court relies, rather, on the Act's inclusion of anyone employed "in any process or occupation necessary to the production" of goods for commerce.

The reasoning seems to be as follows: The oil will pass into commerce if it is mined. But it cannot be mined unless somebody drills a well. An independent contractor's men do part of the drilling. Their work is "necessary" to the mining and the transportation of the oil. So they fall within the Act.

This is to ignore all practical distinction between what is parochial and what is national. It is but the application to the practical affairs of life of a philosophic and impractical test. It is but to repeat, in another form, the old story of the pebble thrown into the pool, and the theoretically infinite extent of the resulting waves, albeit too tiny to be seen or felt by the exercise of one's senses.

The labor of the man who made the tools which drilled the well, that of the sawyer who cut the wood incidentally used, that of him who mined the iron of which the tools were made, are all just as necessary to the ultimate extraction of oil as the labor of respondents. Each is an antecedent of the consequent,—the production of the goods for commerce. Indeed, if respondents were not fed, they could not have drilled the well, and the oil would not have

gone into commerce. Is the cook's work "necessary" to the production of the oil, and within the Act?

I think Congress could not and did not intend to exert its granted power over interstate commerce upon what in practice and common understanding is purely local activity, on the pretext that everything everybody does is a contributing cause to the existence of commerce between the States, and in that sense necessary to its existence.