The plaintiff seeks to recover the sum of $155.04 as unpaid overtime wages, an equal amount as liquidated damages, and the sum of $150 as attorney's fees claimed to be due him under the Fair Labor Standards Act of 1938, 52 Stat. 1060, 29 U.S.C.A. § 201 et seq., as an employee of the defendant company.
He alleges that on November 9, 1942, and for some time prior thereto, and up to and including date of December 9, 1942, and at the time of filing the suit, the defendant company was engaged in the business of industrial engineering and building in the Parish of Calcasieu; that, specifically, said defendant was engaged in the construction, under contract, of a plant for the manufacture, sale and distribution in interstate commerce, of synthetic rubber or ingredients for the manufacture thereof; that the construction work in which the defendant was presently engaged was necessary to the production of goods for sale, distribution and transportation in interstate commerce.
He further alleges that between dates of November 9, 1942, and December 23, 1942 (a period of 45 days), he was employed by the defendant in its construction project in the capacity of a guard; that his duties were to guard and protect the materials and supplies of defendant on its construction project, "to prevent trespass of unauthorized persons on the construction project, and to carry out *Page 589 
generally orders from his employer, looking to the safeguard of its property received, handled and used in said work; that said construction work is a vitally necessary project to the national defense, and petitioner's employment was essential in safeguarding and protecting said work; that the functions performed by petitioner in his said employment were essential and necessary to the ultimate result to be attained by said construction work of his said employer * * *".
He further alleges that from the very nature of defendant's business, it is engaged in interstate commerce, and in the particular project it is engaged in a process or occupation necessary to the production of goods for shipment in interstate commerce; and as a consequence of his employment he is thus engaged; thus, that he and his employer come within the policy, meaning, purview and intent of the Fair Labor Standards Act, as set out in United States Code Annotated, Title 29, Sections 201 to 219, each inclusive.
He further alleges that under his contract of employment, he was to receive $38.08 per week; that he worked 45 days of eight hours each (or a total of 360 hours, or 6 3/7 weeks); that he was paid on the basis of a 7-day week, receiving from his employer the sum of $239.36. He contends that he should have been paid for nine weeks of 40 hours each, or a total of $342.72, thus making an overtime of $103.36, plus 50% of the latter sum, or $155.04, plus a like sum as liquidated damages, aggregating $310.08, plus a reasonable attorney's fees of $150, all in accordance with the Act supra.
As a second cause of action, he seeks to recover damages in the sum of $250 under Article 2315 of our Civil Code based upon two letters which he alleges were written and mailed to him by the agents or representatives of the defendant and which he contends were a libel causing him severe mental pain and anguish.
The defendant appeared and filed several exceptions, which were overruled, and for answer admits that plaintiff was in its employ for the period alleged, at a salary of $38.08 per week, and that it had a construction job in the Parish of Calcasieu, but categorically denies that it was engaged in interstate commerce and that plaintiff was engaged in the production, manufacturing, mining, handling, transporting or in any other manner working on said goods, or in any process or occupation necessary to the production thereof, and that his employment came within the purview of the said Fair Labor Standards Act. Defendant, in its answer, sets out that the letters written by its agents or employees and received by the plaintiff were simple letters demanding the return of defendant's badge which had been given to plaintiff and which showed plaintiff's employment.
The case was submitted on an agreed statement of facts, with documents attached, and the testimony of four witnesses. The trial judge dismissed the suit. Plaintiff has appealed. The exceptions filed by the defendant in the lower court are not urged before this court and the case before us is to be considered entirely on the merits.
We quote the agreed statement of facts:
"The defendant, The H.K. Ferguson Company was, between the dates of November 9, 1942, and December 23, 1942, inclusive, engaged in the construction of buildings within Calcasieu Parish, Louisiana, as agent for the Defense Plant Corporation, an instrumentality of the Federal Government; it being the intention that said buildings will be used, when completed, to process raw materials for the manufacture of synthetic rubber by the Firestone Tire Rubber Company, or others, who might lease or buy the property from the Defense Plant Corporation. The materials which will be produced in this plant are expected to be shipped from Louisiana to other states and possibly foreign countries.
"That defendant herein are industrial engineers and builders and that they carry on construction work as their business in different states of the union and in foreign countries.
"Plaintiff was employed by defendant on November 7, 1942, to work as a guard, and began to work on November 9, 1942, and worked consecutively until December 23, 1942, a period of forty-five days, seven days a week, eight hours per day, at the agreed wages of Thirty-Eight and 08/100 ($38.08) Dollars a week and was paid a total of Two Hundred Thirty-Nine and 36/100 ($239.36) Dollars, including Social Security deductions. Plaintiff started to work at the plant site, at which time ditches were being dug, and the beginning of construction of temporary office buildings was going on. At that time, plaintiff *Page 590 
was posted at the gate and on the property as a guard to prevent unauthorized persons from going in or about the property. He worked thus for about two weeks; thereafter, and during the rest of the period he was employed he worked in the Town of Sulphur, at which point the defendant was operating a batch plant where sand and gravel was being mixed and plaintiff did similar duties there in guarding and preventing the entrance of unauthorized persons, or injury to or the removal of any of the equipment or materials at the batch plant. In connection with the above stipulation, parties hereto file in evidence document marked `P-1' and exhibits `D-1' and `D-2'. And it is admitted that plaintiff signed documents `D-1' and `D-2' and that Mr. R.N. Jernigan, Personnel Manager of defendant company, signed and gave to plaintiff document marked `P-1'.
"Defendant admits that document referred to as `P-2' was sent to plaintiff by mail, in a sealed envelope, at his residence address at Sulphur, Louisiana, and the same admission is made with reference to document marked `P-3' and defendant also admits that document marked `P-4' was delivered to plaintiff on the date it bears."
The document marked "P-1" is an "assignment authority" signed by the Personnel Manager of defendant, under date of November 7, 1942, showing that plaintiff was accepted for employment as a guard at a salary of $165 per month, or $38.08 per week, and was assigned Badge No. D-75.
Exhibit "D-1" is the signed application of plaintiff to the defendant wherein he applied for employment as "Guard Duty" at the "Rubber Plant", at a stipulated salary of $165 per month, and in which he gave certain information as to his age, religion, weight, height, etc., and a record of present and past employment, and a statement that he would be ready for duty on November 9, 1942. Exhibit "D-2" is an agreement between the United States and plaintiff wherein he states that he is about to be employed by the defendant as a guard at "Firestone Tire 
Rubber Plant, at Lake Charles, for the purpose of guarding certain war material, war premises, and war utilities, and in which he makes oath to support the Constitution, bear true faith and allegiance thereto, well and faithfully discharge his duty as a civilian auxiliary to the military police, and that the appropriate Articles of War have been read and explained to him, and that in the performance of his duty to protect such war material, war premises and war utilities."
Exhibit "P-2" is a letter written on the stationery of the defendant, signed by the Personnel Manager and the Safety Director, of date of January 29, 1943, addressed to the plaintiff at Sulphur, Louisiana, and which reads as follows:
"According to our records you were recently employed by us as a Guard and it seems that you failed to turn in your Badge No. D-75 when you were terminated.
"You are no longer authorized to wear or have our Badge in your possession, and you are exposing yourself to suspicion and possible serious embarrassment by holding it. This would be especially true and hard for you to explain if anything occurred requiring attention of the Federal Bureau of Investigation as this is a Defense Plant, and everything here is under close observation of representatives of the United States Government.
"We request that you return your Badge to us immediately by Registered Mail so you can have a receipt for it and be in the clear. We hope you will attend to this today."
Exhibit "P-3" is a letter in the same words and phrases as "P-2", save and except that the date is February 8, 1943.
Exhibit "P-4" is a receipt signed by Mr. D.C. Warner, who was the Safety Director of defendant, being dated February 9, 1943, and which reads: "Received badge number D-75 from Mr. Lyons on January 23, 1943."
Plaintiff's testimony is that when he received the first letter, he paid no attention to it. When he received the second letter, he became "worked up. Looked like they might throw me in jail". He had given the badge the day they had terminated him, inferring that it was on December 23, 1942. On the next day of receiving the second letter, he left his employment at noon and visited defendant's plant to straighten out the matter of the badge. He then stated to defendant's agent that he had given the badge to Mr. Warner on January 23, 1943, and wanted a receipt showing the date of the receipt of the badge on January 23, 1943, which was a full month after his termination of employment. The testimony of Mr. Warner is that defendant has no record of the *Page 591 
receipt of the badge but since plaintiff was so insistent that he had turned in the badge on January 23, 1943, he, Warner, accepted plaintiff's word to that effect, and that the receipt was thus signed.
The testimony of the other witnesses has practically no bearing on the issues of the case.
The most serious question presented in this case is the applicability of the Fair Labor Standards Act, supra. Numerous cases are cited by counsel on both sides in support of their respective contentions, the plaintiff contending that under the above state of facts he does come under the terms of the Act, and the defendant contending that he does not.
The Act under consideration is "remedial" and should be liberally construed. The applicability of the act depends on the character of activity of the employee and not the business of the employer. The interpretations of the act promulgated by the Administrator of the Wage and Hour Division, United States Department of Labor, although not binding on the courts, are entitled to great weight. Judicial interpretations of "interstate commerce" are as pertinent to consideration of the Fair Labor Standards Act as they would be to any other statute where the question is whether the employee is engaged in interstate commerce. In dealing with this Act state courts must apply the rules of construction obtaining in the federal jurisdiction. With these principles of law applicable to the Act in mind, we now pass to consider the case.
From the agreed statement of facts, it can be inferred that plaintiff was employed in the very beginning of the construction of the proposed plant. His first two weeks were spent in the guarding of the premises of the proposed plant to prohibit trespassing thereon while ditches were being dug and temporary structures were being built; the remainder of his employment was spent at Sulphur, away from the premises of the proposed plant, where sand, rocks or gravel and cement were being mixed to be removed to the premises of the proposed plant. His duties there were likewise to keep trespassers from interfering with the work. During his term of employment there were no goods being manufactured for commerce. In fact, the plant was merely in its embryo state.
In defining what constitutes goods produced for interstate commerce, Section 3 of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 203, Subsection (j), states the term "`Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State."
Thus, it is readily seen that the portion of the language which may have a bearing in determining whether the act is to be applied to the employment of the guard in the case at bar are the words, "or in any process or occupation necessary to the production thereof, in any State", since he was manifestly not engaged in producing, manufacturing, mining, handling, transporting, or in any manner working on such goods.
In adopting the foregoing and rather unusual definition of the term "produce", as related to the production of goods for interstate commerce, so as to include among those engaged in such employment also those in any occupation "necessary" to the production of such goods, it should be presumed that the Congress thus enlarged the meaning of the term as far as it was deemed expedient. Although numerous terms used in the act are specifically defined therein, the meaning of the word "necessary" was not defined, evidently leaving the meaning of the word to be as defined in Webster's Dictionary — "Essential to a desirable or projected end or condition; not to be dispensed with without loss, damage, inefficiency or the like; as, a necessary tool". Moreover, unless the term "any occupation necessary to the production thereof" is to be given an expanded meaning by judicial construction, it may be confidently asserted that under the agreed statement of facts in the instant case, the act would not have any application, since the work of this plaintiff had only the most remote relation, and was not in any fitting sense "necessary" to the intended production of goods for interstate commerce by the owner or lessor of the proposed plant. *Page 592 
In our exhaustive research of the cases dealing with the applicability of the Act to guards or watchmen the Act was held to apply in only such cases wherein the facts showed that either the employers or the lessees were actually engaged in the production and the processing of goods for interstate commerce, such as the cases of Acme Lumber Co. v. Shaw, 243 Ala. 421,10 So.2d 285; Kirschbaum v. Walling (Arsenal Bldg. Corp. et al. v. Walling), 316 U.S. 517, 62 S.Ct. 1116, 1121, 86 L.Ed. 1638. The underlying reason for such holding is expressed by Justice Frankfurter in the cases of Kirschbaum and Arsenal Bldg. Corp. supra, as follows: "In our judgment, the work of the employees in these cases had such a close and immediate tie with the process of production for commerce, and was therefore so much an essential part of it, that the employees are to be regarded as engaged in an occupation `necessary to the production of goods for commerce.'" Such is not the case at bar. In our case plaintiff was engaged as a guard, guarding the premises and materials upon which and for which a building was to be constructed, which building would probably be used as a manufacturing plant. His services had not "such a close and immediate tie" with the intended future process of production; his services were too remote to be considered as such.
The plaintiff strongly relies on the case of Warren-Bradshaw Drilling Co. v. Hall et al., 317 U.S. 88, 63 S.Ct. 125, 126. The facts in that case as found by the Court were:
"Petitioner is the owner and operator of rotary drilling equipment and machinery, who contracts with the owners or lessees of oil lands to drill holes to an agreed-upon depth short of oil sand stratum. When that depth is reached, the rotary rig is removed, and the machinery and crew move on to other locations. For reasons peculiar to the oil industry, a cable drilling crew then undertakes with cable tools to `bring in' the well or else demonstrate that it is a dry hole. Respondents were employed by petitioner as members of its rotary drilling crew and worked on approximately thirty-two wells in the Panhandle Oil Field of Texas; thirty-one of those wells produced oil, and the other one produced gas. Petitioner was not the owner or lessee of any of the lands on which respondents drilled, and was not shown to have any interest therein or in the oil produced."
The Supreme Court, in holding that the Act was applicable, says: "Whether or not respondents, in drilling to a specified depth short of oil, may be regarded as engaged in producing or mining, and we certainly are not to be understood as intimating that they may not, recognition of the obvious requires us to hold that at the very least they were engaged in a `process or occupation necessary to the production' of oil. Oil isobtained only by piercing the earth's surface; drilling a well isa necessary part of the productive process to which it isintimately related. The connection between respondents'activities in partially drilling wells and the capture of oil isquite substantial, and those activities certainly bear as `closeand immediate tie' to production as did the services of the building maintenance workers held within the Act in Kirschbaum Co. v. Walling, supra, 316 U.S. [517], at pages 525, 526, 62 S.Ct. [1116], at page 1121, 86 L.Ed. 1638". Says the Court further, 63 S.Ct. at page 127, "The record contains ample indication that there were reasonable grounds for petitioner to anticipate, at the time of drilling, that oil produced by the wells drilled, would move into other states. Petitioner, closelyidentified as it is with the business of oil production, cannot escape the impact of the Act * * *." (Italics ours.)
This case is not applicable to our case. None of the activities of the defendant nor the services of plaintiff bear "close and immediate tie with the process of production for commerce" and was not therefore an essential part of it so as to hold that plaintiff is to be regarded as engaged in an occupation "necessary to the production of goods for commerce."
The authorities with respect to the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., have made a distinction in the case of railroads between new construction and repairs and maintenance. For example, employees engaged in the repair of a railroad bridge are protected by the Employers' Liability Act, Bravis v. Chicago, M. St. P. Ry. Co., 8 Cir., 217 F. 234, whereas those engaged in the construction of a new railroad tunnel are not, Raymond v. Chicago, M. St. P. Ry. Co.,243 U.S. 43, 37 S.Ct. 268, 61 L.Ed. 583. It seems to us that judicial interpretations of interstate commerce are as pertinent to *Page 593 
the consideration of the Fair Labor Standards Act as they would be to any other statute where the question is whether the employee is employed in interstate commerce. Therefore the Act does not apply to employees engaged in the original construction of buildings even though the buildings, when completed, will be used to produce goods for interstate commerce. In this we are supported by the ruling of the Administrator of the Wage and Hour Division, United States Department of Labor, released on May 15, 1941, B-162, with which ruling we are thoroughly in accord, wherein he states that it is his opinion "that generally employees engaged in the original construction of buildings are not within the coverage of the act even though when completed will be used to produce goods for commerce". This ruling, in our opinion, is in accordance with logic and common sense. Although his interpretation is not binding on us, yet it is entitled to great weight. In fact, his interpretation of the Act seems to have been followed by the United States Supreme Court in the case of Warren-Bradshaw Drilling Co. v. Hall, supra, in that, prior to the contest and decision, the then Administrator, release G-162, page 3, stated:
"An oil derrick is erected solely to the end of conducting the subsequent drilling operations as a direct result of which the oil is to be produced. When it is considered that such a derrick, when once erected, cannot conceivably serve any other productive purpose, it becomes apparent that the construction thereof is properly to be regarded as an integral step in the actual drilling operations. It is distinguishable from theconstruction of a factory building which is intended to producespecific types of commodities. The utility of such a factorybuilding is not limited to the production of the commodityoriginally contemplated. There are numerous instances in which, because of economic factors such as fluctuations in the demands for various factory products, plants have been remodeled, new machinery installed, and commodities entirely different from those originally contemplated have been produced. This obvious
distinction urges us to the conclusion that employees who construct an oil derrick should be viewed as engaged in the process of production, but that employees who construct a building in which goods for commerce are to be produced, should be regarded as a step removed from actual productive operations." (Italics ours.)
In so far as plaintiff's demand in tort is concerned, his testimony is that when he received the first letter he did not pay "much attention" to it. It was only when he received the second letter that he became "worked up", yet both letters are verbatim. If he did not consider the first letter of much importance, the second should also not have created in his mind any anxiety. The defendant seemed to have been in good faith. There was no record of it having received the badge given plaintiff at the time of his employment. It was a mere polite demand to return the badge. Plaintiff in the beginning of his testimony states that he surrendered the badge when he was "terminated" on December 23, 1942, yet later on he insisted, as he did on February 9, 1943, that he had surrendered his badge on January 23, 1943, a month later and wanted a receipt so showing. It appears to us that this is "much ado about nothing" and is an after thought of plaintiff in seeking damages. The letters, in themselves, do not show any libel or intention to libel. In fact, the first letter was so considered by plaintiff, and it is our conclusion from the mere reading of the letters that the defendant wrote the letters requesting the return of the badge in kindness to him, setting out the disadvantages to him to retain the badge and in no way attributing any bad faith in not so doing. We cannot see any intention to belittle him in any way.
Plaintiff had the burden to prove that in the course of performing his service for defendant and without regard to the nature of defendant's business, he was, as its employee, engaged in any process or occupation necessary to the production of goods within the meaning of the Act, and that such production was for interstate commerce, and that the two letters written to him caused him any damage. It is our opinion that he has failed to sustain that burden.
For these reasons, the judgment of the lower court is affirmed. *Page 594