## DAMON v. FORD, BACON & DAVIS, Inc.
### Civil Action No. 4131.

District Court, E. D. Pennsylvania.
Sept. 25, 1945.

Harry R. Kozart, of Philadelphia, Pa., for plaintiff.

Ballard, Spahr, Andrews & Intersoll, of Philadelphia, Pa. for defendant.

KALODNER, District Judge.

This action was brought by the plaintiff, Edward E. Damon, against his employer, Ford, Bacon & Davis, Inc., to recover alleged unpaid overtime and liquidated damages pursuant to Section 16(b) of the Fair Labor Standards Act, 52 Stat. 1069 (1938), 29 U.S.C.A. § 216(b), The sole question for determination is whether the plaintiff comes within the protection of the aforesaid Act.

A jury trial was waived, and the case was submitted upon the pleadings and additional evidence. Accordingly, I make the following

#### Findings of Fact

1. The defendant, Ford, Bacon & Davis, Inc., a corporation organized under the laws of New Jersey, was employed by Defense Plant Corporation to construct a large factory at Pottstown, Pennsylvania, known as Plant No. 2, for the manufacture of aircraft engines.

2. Prior to February, 1942, all accounting relating to this construction was controlled through the New York office of the defendant, but, since this proved unsatisfactory, Mr. C. R. Shoemaker, Cost Accountant on this job, was directed to supervise the preparation of an organization chart of the major divisions of the Accounting Department, which was done.

3. Under this chart, which was thereafter adopted in practice by the defendant, a time checking department was created at the job site under the supervision of a Chief Time Checker.

4. On or about February 2, 1942, the plaintiff, Edward E. Damon, a resident of

Pennsylvania, was hired by the defendant for the position of Chief Time Checker at a stated minimum salary for a 50 hour week with straight overtime for 50 hours of work, provided that absences would be deducted for less than 40 hours work per week, unless such absences were excused. In the case of a resignation in the middle of a week, he was entitled to receive for each day one-fifth of his stated minimum salary. His employment terminated in January, 1943.

5. During the period complained of, Damon, as Chief Time Checker was in charge of the Time Checking Department with approximately 20 employees under his supervision, eight of whom were outside checkers and eight inside checkers, whose activities he directed. In at least one instance he hired an employee.

6. Damon was charged with the preparation of a system of time records for work performed in the construction of this aircraft factory, and its maintenance, including the procurement of time data and the processing of any discrepancies between the records of sub-contractors and those of his department. In addition to accomplishing these assignments, Damon, in the course of his employment, set up a system to expedite the handling of contractors' records.

7. Pursuant to his instructions, Damon prepared time record sheets identifying the particular sub-contractor and the job, listing the respective employees and their time worked. As sub-contractors came on the job, records of their contracts were sent to the Time Checking Department as well as notices of extra work orders and time and material jobs. These time record sheets were distributed by Damon to the outside supervisor of time checkers who allocated them to outside checkers, who noted thereon the straight time and overtime worked by each employee. These sheets were then returned to the clerical section of the Time Keeping Department under the supervision of Damon, and it prepared a summary or recap list. Such summaries when checked against different jobs by the same sub-contractor would disclose any double time charges. Also, these summaries were used to check against the payroll records submitted by the sub-contractors, as well as against their invoices based on their payroll records. If discrepancies between the records of the Time Checking Department and the sub-con-

tractors appeared, the Chief Time Keeper was charged with the duty of correcting the discrepancies by contacting the sub-contractor.

8. In case of discrepancies between the records of Damon's department and the records of sub-contractors, Damon would communicate with the contractors by letter or by telephone, but when a contractor had an office at the construction site, he would adjust the difference with the contractor there.

9. Approximately eighty-six individuals, firms or corporations supplied labor service in connection with the construction of this plant. Of this total, approximately twenty had home offices outside of Pennsylvania.

10. During the eleven and a half month period of his employment, which did not vary in type and character, Damon wrote 176 letters, and made approximately six telephone calls a month, to sub-contractors on this job who had their home offices outside of Pennsylvania.

11. Over the period of his employment Damon worked a total of 539½ hours in excess of 40 hours in each work week. Of such overtime, plaintiff worked 29½ hours at the rate of $50.00 per week, 469 hours at $60.00 per week, and 41½ hours at $65.00 per week.

### Discussion

In Scott v. Ford, Bacon & Davis, D.C.1944, 55 F.Supp. 982, a case involving the present defendant and the same construction job here in controversy, I had occasion to recognize the now indisputable rule, applicable in cases of this kind, that the determination of the question, whether an employee is protected by the Fair Labor Standards Act, is wholly dependent upon the nature of that particular employee's duties. The fact that generally employees of local construction contractors, the proper classification of the defendant here, are not engaged in interstate commerce or in the production of goods for interstate commerce, is not decisive. See Scott v. Ford, Bacon & Davis, Inc., supra; Interpretative Bulletin No. 5, Paragraph 12 (1939), 2 C.C.H. Labor Law Service, Sec. 32, 105.

Plaintiff-employee, of course, carries the burden of proving that he was engaged in interstate commerce or in the production of goods for interstate commerce in order to take advantage of the Act. Warren-Bradshaw Drilling Co. v. Hall, 1942,

317 U.S. 88, 90, 63 S.Ct. 125, 87 L.Ed. 83. Moreover, he must show that a substantial part of his activities was related to interstate commerce or the production of goods for interstate commerce within the meaning of the Act. See Walling v. Jacksonville Paper Co., 1943, 317 U.S. 564, 572, 63 S.Ct. 332, 87 L.Ed. 460.

Here, the plaintiff maintains that he was in fact engaged in interstate commerce. He testified that, in the accomplishment of his duty to adjust differences between the records of sub-contractors and those of his own department, it was necessary to communicate across state lines with those contractors who did not have offices within Pennsylvania. The writing of the letters, it is contended, is sufficient to place the plaintiff in interstate commerce, and the physical movement of the letters constitutes movement in interstate commerce.

The defendant asserts that the plaintiff's duties as described by him do not constitute "engaging in interstate commerce" within the meaning of the Act, that such duties were not a substantial part of his activities, and that, in any event, the plaintiff is exempted by the Act, Sec. 13(a), 52 Stat. 1067, 29 U.S.C.A. § 213(a) because he was an administrative employee.

I am of the opinion this matter may be disposed of on the ground that, even assuming plaintiff correct in the contention that he was engaged in interstate commerce, such activity was not a substantial part of his work week. As to the latter, I do not credit Damon's testimony.

While Damon testified that there were approximately 45 to 50 sub-contractors or sub sub-contractors, of which about half had home offices outside Pennsylvania, the defendant has successfully shown that there were approximately 86 firms or corporations that supplied any type of labor service in the construction of the plant for the Jacobs Aircraft Co. Of these, approximately 20, or about one-fourth, had their offices in another state.

Damon also testified that he wrote from 10 to 15 letters every day of the week, except Sunday, and made six telephone calls a month to those contractors who had their offices in other states, and that two-thirds of his time was spent in obtaining the information necessary for these communications. Damon also stated that the correspondence which he had relative to any particular contract was filed in a folder under the name of the company involved. Contrary to Damon's testimony is the fact that the correspondence files for out-of-state contractors disclose that Damon wrote a total of 176 letters to them during the period of his employment, or about 16 letters a month.

Considering the actual number of letters written, together with the number of telephone calls made, and the number of out-of-state contractors as compared with the total number of contractors, I do not believe Damon could have spent two-thirds of his time in connection with matters relating to the out-of-state contractors. This seems especially true since exactly the same procedure, which certainly was not simple, was followed in all cases in checking the payroll records, invoices, and time records, and this was done without regard to the location of the home office of the contractor.

Regardless of whether the writing of the letters was sufficient, as contended, to put Damon into interstate commerce, I think it clear that the writing of the 16 letters a month could hardly take up anywhere near a substantial part of his work week. I am of the opinion, therefore, that the plaintiff has failed to establish the fact that he was engaged in interstate commerce or in the production of goods for interstate commerce a substantial part of his working time.

Accordingly, I state the following

### Conclusions of Law

1. Where an employee of a construction company, as Chief Time Checker, collates and summarizes reports of time keepers for the express purpose of providing a check on wage payments to be made by the employer to sub-contractors, and in connection with his duties, at infrequent intervals, sends letters and makes telephone calls to sub-contractors in other States, he is not engaged in "commerce" or "production of goods for commerce" within the Fair Labor Standards Act.

2. The plaintiff was not engaged in "commerce" or "production of goods for commerce" within the Fair Labor Standards Act and is not entitled to recover any sum in this cause.

An order may be submitted in accordance with the above.