## URBAN v. VICTORY NAVAL UNIFORM CO.
### Civil Action No. 5480.

District Court, D. Massachusetts.

May 1, 1947.

Roewer, Reel & Donovan and Walter R. Donovan, all of Boston, Mass., for plaintiff.

Richard Badlian, of Boston, Mass., for defendant.

SWEENEY, District Judge.

In this action the plaintiff seeks to recover over-time compensation, liquidated damages, and attorney's fees under Section 16(b) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq. The defendant denies that it was engaged in interstate commerce. The parties agree that, if the plaintiff is to recover anything, he is entitled to be compensated for 1,318 overtime hours amounting to $1,647.50.

### Findings of fact.

The defendant maintains a store for the manufacture, sale, repair, and alteration of naval uniforms and accessories. The company occupies two floors of a building in Dewey Square, just opposite the South Station in Boston. Throughout the war, it carried on an extensive business catering to the clothing needs of thousands of servicemen in the Boston area.

Defendant had 16 employees, including pressers, tailors, and salesmen. Some of the tailors and pressers worked on a part-time basis, particularly during the afternoon and early evening hours when the sailors were on liberty and business was heaviest.

In the salesroom on the second floor, defendant sold ready-made uniforms for petty officers and commissioned officers. The third floor was a combination tailor shop and salesroom where the defendant sold ready-made uniforms for seamen. In the same room defendant manufactured and sold custom-made uniforms to order. The bulk of activities on the third floor consisted of servicing work and alteration. Servicing includes cleaning and pressing, sewing on buttons and zippers, and sewing on the naval ratings the sailor is entitled to wear. Alteration includes cuffing, lining, and alteration of sizes. Defendant not only did the necessary processing of custom-made and ready-made uniforms but serviced the customers' own uniforms as well. There is no segregation of the various operations and

they are all carried on in the same room. Defendant also sold such accessories as buttons, ratings, and other insignia. The business is exclusively retail and there are no mail order or wholesale departments.

About 90% of the ready-made uniforms sold are altered and delivered at the store the same day. If the buyer did not want to pay the full price at once, the store accepted a deposit and held the uniform until the balance was paid. A similar practice was followed for custom made garments. During the war years, the demands of the service frequently shifted naval personnel from place to place on short notice, and a sailor who had left a deposit on a uniform might be unable to return to the store and take delivery. In such cases, defendant shipped the uniform to the place designated by the purchaser. Some of these shipments were to points outside Massachusetts and on them plaintiff grounds his claim that the Act covered his employment.

The shipping journal records the date of the shipment, the name and address of the buyer, and the insurance serial number or C.O.D. charge. It is impossible to determine the contents of each parcel from an examination of the journal. The total number of interstate shipments from March 20, 1944, to August 18, 1945, the duration of the plaintiff's employment, was 237 at intervals of two or three days. Interpreting the journal in the light most favorable to the plaintiff, no more than 140 of the entries reflect uniforms worked on in the tailor shop. During this same period, defendant sold from 60 to 75 ready-made uniforms and from 4 to 6 custom-made uniforms each week. About 50 officers' uniforms were sold each month. The percentage of uniforms shipped in interstate commerce was therefore but a small fraction of the total sales of the company.

Plaintiff was employed as a stitcher or machine operator in the third floor tailor shop from March 20, 1944, to August 18, 1945. He did service work and alteration, and when he was not busy with these operations he assisted in the manufacture of custom-made uniforms. Since only a very few of these uniforms were made each week, he spent a substantially greater percentage of his time working on ready-made uniforms. The issue presented on these facts is whether the plaintiff's production of uniforms was production for commerce within the terms of Section 207 (a) of the Act, 29 U.S.C.A.

Defendant operated what was essentially a retail clothing and tailor shop, making sales for immediate delivery on an over-the-counter cash basis. Whether manufacturing custom-made uniforms or selling ready-made merchandise hanging on the racks, defendant expected deliveries to be made on the premises, on the same day in many cases, or at a later date when the buyer returned to pick up a uniform held on deposit. Shipping uniforms was not the normal and regular course of the business. It is significant that the defendant did not maintain a regular shipping department with employees devoting all or most of their time to this work, and that the shipping journal was kept in a careless and scarcely legible fashion.

■ To constitute production for commerce, an employer must have some intent or expectation that his merchandise, or some percentage of it, will normally enter the channels of commerce. United States v. Darby, 312 U.S. 100, 118, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430; Warren-Bradshaw Drilling Co. v. Hall, 317 U.S. 88, 63 S.Ct. 125, 87 L.Ed. 83. I find that at the time of manufacture or sale defendant could not reasonably anticipate that uniforms would be shipped with some regularity and that, in fact, they were shipped only when an emergency situation made over-the-counter delivery impossible.

The shipping journal records some 237 interstate shipments (not all of which were uniforms) during a period when over 6,000 uniforms were sold on the premises, or about 3% of the total business. Interstate sales of less than $\frac{1}{2}$ of 1% have been held sufficient for coverage under the Act, provided the shipments in commerce are a regularly recurring incident of the business. Mabee v. White Plains Publishing Co., 327 U.S. 178, 66 S.Ct. 511. The emergency deliveries here are distinguishable from the minute but consistent sales to out-of-state purchasers in the Mabee case.

272

## Conclusions of Law.

 I therefore conclude and rule that the plaintiff was not engaged in commerce, or the production of goods for commerce, and that the defendant was not required to pay him in accordance with the overtime compensation provisions of the Act.

Judgment is to be entered for the defendant.