CUASCUT et al. v. STANDARD DREDGING CO.

NEGRIN et al. v. STANDARD DREDGING CO.

Civ. Nos. 3939, 3894.

United States District Court, for the District of Puerto Rico.
San Juan Division.

April 26, 1950.

 917

Santiago De La Fuente and Hipolito Marcano, San Juan, Puerto Rico, Jaime J. Saldana, San Juan, Puerto Rico, Agustin Perez Rodriguez, San Juan, Puerto Rico, Guillermo Bauza, San Juan, Puerto Rico, for plaintiff.

Brown, Newson & Cordova, San Juan, Puerto Rico, for defendant.

CHAVEZ, District Judge.

From September 9, 1939 to November 1943, defendant was engaged in dredging operations in San Juan Bay and at or near Arecibo, Puerto Rico. These dredging operations consisted of six separate and distinct projects to wit: (a) widening and deepening the entrance channel and turning basin to San Juan harbor; (b) dredging material to fill Isla Grande, San Juan, Puerto Rico, as a preliminary step in the construction of an airbase for the United States Navy; (c) dredging an entrance channel and adjacent waterfront for a dry dock of the United States Navy, at San Juan, Puerto Rico; (d) dredging an entrance channel and adjacent waterfront for a terminal at Catano, Puerto Rico of the United States Army; (e) dredging harbor at Arecibo, Puerto Rico; (f) deepening the west side of Pier 1 San Juan Harbor for the United States Navy.

It is defendant's contention that plaintiffs are not covered by the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., because, (A), the work performed by plaintiffs during the course of the dredging operations was not of such a nature as to be engaged in commerce as the work was new construction and not repair or maintenance work and, (B), with respect to projects (b), (c), (d) and (f), that the same were of a military nature involving construction work of a military nature for the United States for use by the sovereign power either in connection with its defense program or in the prosecution of the war and were, therefore, not activities constituting commerce. With respect to project (e), it is contended that, at the time the project was being executed, the Port of Arecibo was closed due to war, and did not constitute an instrument of interstate commerce.

I. Project (a), being the widening and deepening of the entrance channel and turning basin of San Juan Harbor.

This project extended from just beyond Morro Point (Ex. H, Defendant) to the end of the channel proper off Puntilla Point, and thence into the turning basin. (The area marked "C" on Ex. H.) It is admitted that the purpose of this operation was to widen and deepen the channel and turning basin.

The city of San Juan was founded in the year 1521, when it was decided by the colonizers to abandon an earlier settlement inland on the main island of Puerto Rico.

Since that date, an ever increasing maritime traffic has plied through the waters of both the channel and the turning basin area. Every type of vessel engaged in commerce, from the caravels and galleons of the Spaniards to steam propelled vessels, sailed into San Juan Harbor, long before the Fair Labor Standards Act was enacted. These ships came from all parts of the world, and departed from San Juan bound to ports the world over. The waters comprised in project (a), therefore, have been instrumentalities of commerce since 1521.

The only question is whether the deepening and widening of the channel and turning basin constitute a repair and maintenance of said instrumentality so as to place plaintiffs in commerce, or whether said operation constituted a new construction.

In Walling v. Patton-Tulley Transportation Co., 6 Cir., 134 F.2d 945, 947, some of the plaintiffs were engaged in the construction of dikes and revetments in the Missouri and Mississippi rivers. The District Court held that the dikes and revetments constituted a construction operation rather than one of maintenance or repair of an interstate facility. The Circuit Court of Appeals overruled this theory, saying: "The short answer is that the Mississippi River has been a highway of interstate commerce since states were first carved out of its contributory territory, and so the reasoning that construction upon a highway not yet utilized for interstate commerce is not work in interstate commerce does not apply."

The factual situation in the case now before the Court is entirely different from that in the case of Nieves v. Standard Dredging Corporation, 1 Cir., 152 F.2d 719, 721. In that case, to quote from the opinion of the Court, "the land was a swampy wilderness and that portion of the bay where the dredging was done could only be used by small row boats. It had never been used in interstate commerce. The work carried on was not repair or maintenance work; its purpose was not to widen or deepen an already existing channel or to remove deposits from an old unused water passage which had formerly been used as a highway of commerce."

Project (a), consisting of the deepening and widening of an already existing highway of interstate commerce, cannot be considered a new construction, but rather the maintenance of a channel of commerce, and the plaintiffs engaged in the dredging were engaged in commerce under the Fair Labor Standards Act.

II. Dredging done for the purpose of obtaining fill material for Isla Grande Naval Air Base.

Project (b) consisted in the dredging of certain areas, called "Borrow Pit Areas" from which material was deposited on the then swampy Isla Grande. These areas are marked "Contracts 314, 324, 329, 331, 334 and 353" on Defendant's Exhibit H. The "Borrow Pit Areas" comprised in Contracts 331, 334 and 353 were located on the northern side of San Antonio Channel. For clarity it is necessary to discuss these areas before taking up the Borrow Pit dredging on the remaining, or southern areas, included in Contracts 314, 324 and 329. This Northern side of Isla Grande is known as the San Antonio Channel, and appears thus on Exhibit H.

The testimony shows that for many years prior to the dredging of San Antonio Channel by defendant, three and four-masted schooners from foreign countries and the United States would travel through the waters of San Antonio channel and anchor there, and that pleasure craft, such as yachts which would come in from the Virgin Islands would anchor by the Club Nautico (Yacht Club) at the foot of the Channel was also used by Pan American Airways hydroplanes for taking off and landing operations. Indeed, Pan American had a small airport alongside the channel, on the firm part of Isla Grande.

There is no question that San Antonio Channel was a highway of interstate commerce prior to, and at the time of the dredging. The question is whether operations whose primary purpose is construction (fill of Isla Grande) for a Naval Air Base but which incidentally results in maintenance and repair of an inter-

state waterway is covered by the Fair Labor Standards Act.

The position is that although Standard Dredging's business in dredging San Antonio Channel might, from the nature of its contracts with the Government, be considered primarily the construction of a naval base, the work plaintiffs were engaged in was, as a matter of fact, an actual deepening of San Antonio Channel, albeit the material they dredged was, under their employer's contract, finally deposited on Isla Grande, the removal of material from the channel by plaintiff's labor deepened an already existing interstate waterway.

In Overstreet v. North Shore Corporation, 318 U.S. 125, 63 S.Ct. 494, 498, 87 L.Ed. 656, the Court said: "The nature of the employer's business is not determinative, because as we have repeatedly said, the application of the Act depends upon the character of the employees' activities. A. B. Kirschbaum Co. v. Walling, supra, 316 U.S. 517, at page 524, 62 S.Ct. [1116], at page 1120, 86 L.Ed. 1638; Warren-Bradshaw Drilling Co. v. Hall, 317 U.S. 88, 63 S.Ct. 125, 87 L.Ed. 83.

■ Plaintiffs' work deepening San Antonio Channel, an artery of interstate commerce, was so closely related to such commerce as to be in practice and in legal contemplation a part of it. See Pedersen v. Delaware, L. & W. R. Co., 229 U.S. 146, 33 S.Ct. 648, 57 L.Ed. 1125, Ann.Cas. 1914C, 153.

We now turn to the dredging of the Southern Borrow Pit area, comprising contracts 314, 324 and 329, commencing at a point near Yaboa Shoal and extending along the southern side of Isla Grande. There is no testimony with regard to this Borrow Pit Area, the testimony being confined to contract no. 347, a little to the south. Therefore, as the Court does not have any facts concerning the nature of the work performed by plaintiffs in the Southern Borrow Pit, the Court is unable to reach any conclusion with respect to contracts 314, 324 and 329, and that part of the complaint referring to work done in these areas is dismissed.

### III. Dredging of Channel and Turning Basin for the Navy Graving Dock.

The testimony with respect to project (c) is to the effect that at least since the year 1905, the waters under which the graving dock channel and turning basin were dredged have borne interstate traffic. This consisted of schooners bringing mangrove bark from Venezuela to a tannery located at Miraflores, beyond the site of the graving dock; schooners laden with mahogany from Cuba, consigned to a box factory located beside the tannery; lighters carrying raw material for fertilizer from shipside at Pier Ten to a factory located at the edge of Cano de Martin Pena; barges loaded with coconuts destined for the continental United States passed through these waters to steamers at the piers in San Juan where they were transshipped to steamers.

It is contended, however, that this project was of a purely military nature, as the dredging was for the purpose of providing ingress and egress of naval vessels to the graving dock. In discussing a similar situation the Circuit Court of Appeals, in Ritch v. Puget Sound Bridge & Dredging Co., 9 Cir., 156 F.2d 334, 335;

"The channels and berths of the pier are to be used by combat vessels moving in the navigable waters of Puget Sound into and resting in and moving out of the berths. The repair facilities are intended to be used for such combat vessels.

"Congress by direct legislation and the President acting under Congressional grant of power, have given to naval combat vessels many non-combat functions in maritime commerce. It has defined the word 'commerce' as used in the Fair Labor Standards Act, 29 U.S.C. § 203, 29 U.S.C.A. § 203, as ' "Commerce" means trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof.'

"The construction of these terms is under the rule stated in Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332,

87 L.Ed. 460, and Overstreet v. North Shore Corporation, 318 U.S. 125, 128, 63 S.Ct. 494, 87 L.Ed. 656, 'It is clear that the purpose of the Act was to extend federal control in this field throughout the farthest reaches of the channels of interstate commerce.' [317 U.S. 564, 63 S.Ct. 335].

"All vessels of the Navy, including combat vessels, are radio stations which may engage in 'communications' in the transmission of commercial radio messages from the home offices in the states to commercial vessels at sea. 47 U.S.C. §§ 327, 360, 47 U.S.C.A. §§ 327, 360. The latest provision for the compensation for such communications appears in Appendix III to Communications Instructions United States Navy, D.N.C. 5, setting up rates and procedures for 'Toll traffic.'

"Combat vessels also are engaged in the transport of the mails of non-combatants as well as combatants under contracts with the Postmaster General. They also engage in the 'transportation' of the goods of private persons under bills of lading issued by the officers of such ships, for which Article 1815(4c) of the Shipping Guide of the Bureau of Supplies and Accounts sets up the rates and procedure. This is now done with the cooperation of the War Shipping Administration under the authority of Executive Order 9054, of February 7, 1942, 50 U.S.C.A.Appendix, § 1295 note, Cum.Supp. C.F.R. chap. 3.

"All naval vessels are engaged in the transportation from out of the states of commercial merchandise which is sold as an ordinary commercial transaction at a profit to those on board. United States Navy Regulations of 1920, Arts. 1402, 1403, 1404.

"While witness Jacks (status not given) stated that the new pier itself 'was not intended to be used as a commercial freight pier, but rather for mooring combat ships undergoing overhaul,' Congress has provided that under orders of regulations of the Secretary of the Navy the 'government force at a Navy Yard' may work on merchant ships 'for private individuals or corporations.' 34 C.R.F. § 1, 1995.

"Congress in 1918 authorized the use of Naval vessels in the salvage for compensation of merchant ships, including, of course, those sailing from a state. 34 U.S.C.A. § 472. Cf. The Impoco, D.C., 287 F. 400, where the United States officers and crew of an Army transport were awarded compensation for the salvage of a merchant vessel; the Borgfred, Virgin Islands, 1936 A.M.C. 804, 806.

"(1) Apparently none of these commercial uses of combat ships and of naval construction facilities shown in legislation and regulations of which we take judicial notice was called to the attention of the district court. That court dismissed the complaint on the ground that the channels and pier were 'for the exclusive use of the United States Navy. They were not for general commerce or for any commerce except the use of the Navy.' [Ritch v. Puget Sound Bridge & Dredging Co., D.C.], 60 F.Supp. 670, 672.

"(2) Since the combat ships are so engaged in commerce for the use of private persons, that is in transportation, transmission and communication for such persons, the contractors' deepening of the navigable waters by the channels, with the retaining walls to prevent the silting of the channels from the pier sides, for the ships' navigation into the berths, is engaging in commerce as in Walling v. Patton-Tulley Transportation Co., 6 Cir., 134 F.2d 945, 947."

 It is clear that the men engaged in dredging under Contract No. 347 are covered by the Fair Labor Standards Act.

Inasmuch as project "f", deepening of the west side of Pier No. 1, San Juan Harbor to permit berthing of vessels of great draft presents the same situation, I take it out of order and hold that this also constituted engagement in an activity so essential to interstate commerce as to be a part of it.

IV. Contracts No. 361 and 385, being construction of a channel and turning basin for the Army Pier at Catano.

With the problem of the Army Terminal dredging we are confronted with the situ-

ation which, of all the divers operations in San Juan Harbor, most closely approaches the factual picture before the Court in Nieves v. Standard Dredging Corp., 1 Cir., 152 F.2d 719. In that case defendant carried on dredging operations for a site for a channel, graving dock and adjacent waterfront in Puerca Bay, Puerto Rico, as part of the construction of the United States Naval Base known as Roosevelt Roads. Prior to this dredging work the shores of Puerca Bay were a swampy, almost entirely uninhabited wilderness. The bay itself had not been used by ships of any kind for the purpose of delivering and receiving merchandise to or from Puerto Rico. It could only be used by small rowboats. The Court stated as follows, 152 F.2d at page 721: "In the instant case the land was a swampy wilderness and that portion of the bay where the dredging was done could only be used by small row boats. It had never been used in interstate commerce. The work carried on was not repair or maintenance work; its purpose was not to widen or deepen an already existing channel or to remove deposits from an old unused waterpassage which had formerly been used as a highway of commerce. Nothing like dikes or revetments were being installed to affect the flow of the current of an interstate highway. The work upon which the plaintiffs were engaged was not repair or maintenance to an existing dry dock and channel; it was new and original construction in preparing a site for such a dock and a passageway to it, which had not yet been used in interstate commerce. Thus we feel that the Raymond case, [Raymond v. Chicago, M. & St. P. R. Co., 243 U.S. 43, 37 S.Ct. 268, 61 L.Ed. 583] is controlling and that the plaintiffs were not engaged in commerce within the meaning of the Fair Labor Standards Act."

The waters in which the Army Terminal dredging took place never accommodated craft of more than 3 or 4 feet draft, as they never were deeper than 4 or 5 feet. Some light boats traversed the area prior to the dredging, carrying dynamite which under the law, could not be stored in the metropolitan area of San Juan. This dynamite was discharged from steamers moored in the open harbor (they could not berth at a pier while laden with dynamite) into small craft rigged with one sail, and then unloaded on the Catano shore. This is the only basis for a finding of interstate commerce in connection with this project. There was some unsatisfactory testimony about lighters carrying gasoline to a distillery some distance from the site of this project, but apparently this covered another waterway.

There is no testimony to show whether delivery of the dynamite by the ocean carriers to the consignees thereof occurred at the magazine on the Catano shore, or at the moored ships in the mooring area of San Juan Harbor. *Certainly plaintiffs have not shown by a preponderance of the evidence, that the interstate voyage of the dynamite did not end when the ocean going ships dropped anchor in the deep waters of San Juan Harbor.* There is no evidence, and the plaintiff has the burden of proof, to the effect that the dynamite came to rest from its interstate journey at Catano and that they were still in interstate rather than intrastate while being carried over the very shallow waters of project (d). I, therefore, conclude that these waters never constituted a highway of interstate commerce and the work performed thereunder was not improvement of an already existing instrumentality of such commerce.

V. Dredging of Arecibo Harbor.

The Port of Arecibo was closed, because of war, before, during and after the dredging operations. It remains closed at this writing. Prior to the closure, merchandise was unloaded from ships in the outer harbor, and carried to the shore in barges; and merchandise *consigned to continental United States was carried from the shore in barges and loaded on the moored ocean vessels.* Whatever may have been the status of the incoming goods after they were discharged on to barges, the outgoing goods started *their interstate voyage* when they left the Arecibo shore in barges. Thus these waters, before the

closure of the Port, were on interstate highway.

The Supreme Court, in Industrial Accident Commission v. Davis, 259 U.S. 182, 42 S.Ct. 489, 66 L.Ed. 888, cited in the Nieves case, held that: "Repair work on an instrumentality which had previously been used in interstate commerce, but which was removed from such work for repair and later returned to use in interstate commerce was not considered sufficient to warrant a finding that employees engaged in such repair work were engaged in interstate commerce."

As these waters had been withdrawn from interstate commerce prior to the dredging, I hold that plaintiffs' work in Arecibo Harbor was not covered by the Act.